# UNITED STATES DISTRICT COURT
for the

Middle District of Tennessee

| | |
|---|---|
| United States of America<br>v.<br>GILBERT ROSS GHEARING<br><br>*Defendant(s)* | )<br>)<br>) Case No. 19-mj-4137<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of January 21, 2019; February 4, 2019 in the county of Clay in the Middle District of Tennessee, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, U.S.C., Section 841(a)(1) | Distribution of Schedule II Controlled Substances |

This criminal complaint is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Jason T. Bell, Special Agent HHS-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5/17/19

_____
*Judge's signature*

City and state: Nashville, Tennessee

Magistrate Judge ALISTAIR NEWBERN
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 19-mj-4137 |
| v. | |
| GILBERT ROSS GHEARING | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Jason T. Bell, a Special Agent with the U.S. Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), being duly sworn, deposes and states:

### INTRODUCTION AND AGENT BACKGROUND

1. I have been employed as a Special Agent with HHS-OIG since January 2007. I am presently assigned to the Nashville Field Office. I was previously employed as a Special Agent with the U.S. Department of State, Diplomatic Security Service. During the course of my law enforcement career I have received specialized training in and have led, conducted, and/or participated in criminal investigations of violations of various Federal laws including fraud, money laundering, and drug diversion.

2. This Affidavit is based in part on my personal knowledge, information provided by Special Agents and Task Force Agents of the U.S. Drug Enforcement Agency ("DEA") and Special Agents of the Tennessee Bureau of Investigation ("TBI") (collectively "Agents"), and on my experience and background as a Special Agent with HHS-OIG. I have also learned of the matters addressed herein based on facts disclosed during the investigation, including medical records, expert reports, and witness interviews. Since this Affidavit is being submitted for the limited purpose of securing an arrest warrant of Gilbert Ross GHEARING, I have not included

each and every fact known to me concerning this investigation, nor am I requesting that the Court rely on any facts not set forth herein. I have set forth only the facts that I believe are necessary to establish probable cause to believe that issuance of the requested arrest warrant is proper.

3. This statement is made in support of an application for a complaint and arrest warrant of Gilbert Ross GHEARING, hereinafter referred to as "GHEARING," for the offenses of distribution of Schedule II controlled substances, without a legitimate medical purpose and outside the usual course of professional practice, to D.G. on or about January 21, 2019, and to W.B. on or about February 4, 2019, in the Middle District of Tennessee, in violation of Title 21, United States Code, Section 841(a)(1).

## BACKGROUND: CONTROLLED SUBSTANCES ACT

4. The Controlled Substances Act ("CSA") governs the manufacture, distribution, and dispensing of controlled substances in the United States. *See* 21 U.S.C. § 801 *et seq*. It is a federal offense for any person to knowingly or intentionally distribute or dispense a controlled substance except as authorized by law. *See* 21 U.S.C. § 841(a)(1) ("Section 841(a)(1)").

5. Medical professionals, including physicians, registered with the Attorney General are authorized under the CSA to write prescriptions for, or to otherwise distribute or dispense, controlled substances, as long as they comply with requirements under their registration. Title 21, United States Code, Section 822(b). Such medical professionals are then assigned a registration number with the DEA.

6. To comply with the terms of their registration, medical professionals cannot issue a prescription for a controlled substance unless it is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). Section 1306.04(a) provides that:

A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of Section 309 of the Controlled Substances Act (Title 21, United States Code, Section 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions relating to controlled substances.

7. A medical professional violates Section 841(a)(1) when he or she knowingly issues a prescription for a controlled substance that is not for a legitimate medical purpose within the usual course of professional practice.

8. The CSA and its implementing regulations set forth which drugs and other substances are defined by law as "controlled substances" and further assigns each drug or substance to one of five schedules (Schedule I-V), depending on the drug or substance's potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

9. Schedule II drugs contain those commonly referred to as "opioids," such as Oxycodone, Oxymorphone, Hydrocodone, Oxycontin, fentanyl, and morphine sulphate. These drugs are highly addictive prescription painkillers, which may lead to severe psychological or physical dependence, overdose or death. These drugs are also routinely diverted for non-legitimate medical purposes and are often sold after prescribed and abused by those seeking a euphoric feeling or "high" from the drug.

10. Schedule IV drugs include, among others, benzodiazepines, which are commonly used to treat insomnia and anxiety. There is a potential for dependence and abuse of

benzodiazepines particularly by individuals with a history of substance abuse. Alprazolam (Xanax) and clonazepam (Klonopin) are some of the most prescribed benzodiazepines and most frequently encountered benzodiazepines on the illicit market.

11. In March 2016, the Centers for Disease Control and Prevention ("CDC") issued CDC Guidelines for Prescribing Opioids for Chronic Pain. In that guidance, the CDC warned that medical professionals should avoid prescribing opioids and benzodiazepines concurrently whenever possible because of the risk of potentially fatal overdose.

12. In August 2016, the U.S. Food and Drug Administration ("FDA") issued a Boxed Warning to the drug labeling of prescription opioids and benzodiazepines. The FDA specifically warned that combined use of opioids and benzodiazepines depress the central nervous system and results in serious side effects, such as slowed or difficult breathing and death. The FDA, because of this harm, warned health care professionals to limit prescribing opioids with benzodiazepines and cautioned that such medications should only be prescribed together for those patients for who alternative treatment options are inadequate.

## THE INVESTIGATION

13. There is probable cause to believe GHEARING has distributed controlled substances for no legitimate medical purpose and outside the usual course of professional practice.

14. GHEARING is a physician licensed with the State of Tennessee since about January 24, 1986. GHEARING, according the State of Tennessee, specializes in family medicine.

15. GHEARING owns and operates a family medical clinic Dr. Gilbert Ghearing Family Medicine and Obstetrics, located at 151 McArthur Avenue, Celina, Clay County, Tennessee 38551 ("medical practice"). He also has provided medical services at other locations in Clay and Fentress County, Tennessee. Clay and Fentress Counties are in the Middle District of

Tennessee.

16. GHEARING has a DEA registration number (BG8284907), that allows him to write prescriptions for controlled substances. As such, he agreed to be bound by the laws, rules and regulations that govern controlled substances.

17. On February 7, 2019, the Honorable Jeffrey S. Frensley, U.S. Magistrate Judge in the Middle District of Tennessee, signed a federal search warrant which allowed law enforcement to search GHEARING's medical practice. On March 14, 2019, the Honorable Jeffrey S. Frensley, U.S. Magistrate Judge in the Middle District of Tennessee, signed a federal search warrant which allowed law enforcement to obtain communications from the electronic medical records system utilized by GHEARING's medical practice.

**A. Patient D.G.**

18. From on or about August 2016 and continuing through January 2019, GHEARING unlawfully distributed Schedule II and Schedule IV controlled substances to patient D.G. that were not for a legitimate medical purpose within the course of professional practice, as described in more detail below.

19. D.G. is a former patient of GHEARING.

20. From approximately August 2016 and continuing through January 2019, GHEARING prescribed D.G. Clonazepam (1 MG), a benzodiazepine and a Schedule IV controlled substance, also known by its name brand Klonopin. Beginning in or around August 2018, GHEARING also prescribed D.G. Oxycodone-Acetaminophen (10 MG), an opiate and a Schedule II controlled substance, also known by its brand name Percocet.

21. As described above, the CDC and the FDA advises medical practitioners against prescribing an opiate in combination with a benzodiazepine because of a high risk of death.

22. According to medical practice emails, staff interviews, and an interview with D.G.'s mother, between 2016 and 2018, D.G.'s mother, G.W., called the medical practice multiple times to communicate that D.G. abused D.G.'s controlled substance medications. G.W. requested that GHEARING stop prescribing the medications. These concerns were communicated multiple times to GHEARING by G.W., and by medical practice staff. According to G.W., GHEARING acknowledged to G.W. that D.G. had an addiction problem. Other medical practice staff reported knowing D.G. had overdosed multiple times and that D.G. is known to be an addict and an alcoholic whose mother, G.W., had complained to the medical practice multiple times. Despite these concerns, GHEARING continued to prescribe controlled substances to D.G., including at various times and sometimes in combination, the opiate Percocet, and the benzodiazepine Klonopin. An opiate is also a narcotic.

23. On February 7, 2017, GHEARING wrote D.G. a prescription for Klonopin (1 MG). GHEARING's note in D.G.'s medical record for that date states "Patient is doing well and says that he has reduced drug use. He is mentally alert today and very talkative. He was sedated after probably taking most of his Konopin [sic] in one day." D.G. filled the prescription.

24. On February 8, 2017, Clay County EMS responded to a 911 call that D.G. had possibly overdosed on medications. D.G.'s mother reported to EMS personnel that D.G. had a history of taking too many medications. Clay County EMS transported D.G. to the hospital.

25. On February 21, 2017, D.G. returned to GHEARING's medical practice. The medical record states that the reason for the visit is a "[F]ollow up hospital stay."

26. On March 9, 2017, GHEARING wrote D.G. a prescription for Klonopin. D.G. filled the prescription.

27. On August 7, 2018, D.G. refilled a prescription for Klonopin (1 MG), written by GHEARING on June 1, 2018. On August 16, 20 and 23, 2018, GHEARING wrote D.G. prescriptions for Percocet (10 MG). D.G. filled the prescriptions.

28. On August 29, 2018, medical practice staff sent an email to GHEARING informing GHEARING that D.G. had overdosed again and was in the hospital.

29. On September 6, 2018, GHEARING wrote D.G. prescriptions for Percocet (10 MG) and Klonopin (1 MG). D.G. filled the prescriptions.

30. D.G. returned multiple times in the Fall of 2018 and received refills of Percocet and Klonopin.

31. On January 21, 2019, D.G. visited GHEARING. GHEARING's medical record for D.G. states that D.G. presented at the medical practice for "pain." The record from that date notes a past medical history of "[d]rug abuse with narcotics and is on Subutex." It also notes "[o]verdose multiple times." This fact is significant because Subutex is prescribed to patients to treat opiate substance abuse. GHEARING wrote D.G. a prescription for Percocet (5 MG) on January 21, 2019. D.G. filled the prescription the same day.

32. During this current investigation, a medical expert retained by the United States reviewed the medical record for D.G. from GHEARING's medical practice electronic medical records system and concluded the prescriptions were not written for a legitimate purpose in the usual course of professional practice.

33. I have probable cause to believe that GHEARING distributed controlled substances to D.G. by writing a prescription for Percocet (Oxycodone-Acetaminophen), a Schedule II controlled substance, on January 21, 2019, because the prescription was not written for a legitimate medical purpose and was outside the usual course of professional practice.

7

### B. Patient W.B.

34. From on or about March 2017 and continuing through April 2019, GHEARING unlawfully distributed Schedule II and Schedule IV controlled substances to patient W.B. that were not for a legitimate medical purpose within the course of professional practice, as described in more detail below.

35. W.B. is a current patient of GHEARING.

36. Between in or around March 2017 and continuing through April 2019, GHEARING prescribed W.B. Alprazolam (1 MG), a benzodiazepine and a Schedule IV controlled substance, also known by its name brand Xanax, and prescribed Oxycodone-Acetaminophen, in varying strengths (between 5, 7.5, and 10 MG), an opiate and a Schedule II controlled substance, also known by its brand name Percocet. An opiate is also a narcotic.

37. As described above, the CDC and the FDA advise medical practitioners against prescribing an opiate in combination with a benzodiazepine because of a high risk of death.

38. According to medical practice emails, staff interviews, and an interview with W.B., between 2017 and 2019, W.B. has been addicted to controlled substances prescribed by GHEARING. According to W.B., medical practice emails and medical records, and/or witness interviews, GHEARING is aware of the following: (1) W.B. has abused W.B.'s prescribed controlled substance medications, (2) W.B. has stolen and/or been given controlled substance medications from other GHEARING patients, (3) W.B. failed urinalysis drug screens conducted in the medical practice, (4) W.B. failed to show up to the medical practice for pill counts that GHEARING ordered, (5) W.B. tested positive on urinalysis drug screens conducted by his medical practice for other non-prescribed substances, and (6) W.B. has overdosed on the medications prescribed by GHEARING and has been treated in the hospital for overdoses. Concerns about

W.B.'s abuse of W.B.'s prescribed medications have been communicated multiple times to GHEARING by people closely associated with W.B., and by GHEARING's medical practice staff. This is corroborated by emails sent from GHEARING's medical practice staff to GHEARING. According to W.B., GHEARING told W.B. to "slack off" her Xanax after being informed of W.B.'s abuse of the medications and overdoses. Despite these concerns, GHEARING continued to prescribe controlled substances to W.B., including at various times, and sometimes in combination, the opiate Percocet, and the benzodiazepine Xanax.

39. On September 10, 2018, GHEARING wrote W.B. a prescription for Percocet (5 MG). W.B. filled the prescription, and refilled a prescription from GHEARING for Xanax (1 MG).

40. On September 14, 2018, an associate of W.B., C.W., called the medical practice to report W.B. had stolen C.W.'s Xanax. This was communicated to GHEARING. This information is corroborated by an email sent to GHEARING by his medical practice staff. C.W. is also a patient of GHEARING.

41. On September 29, 2018, W.B. refilled the prescription for Xanax, demonstrating GHEARING did not call the pharmacy to cancel W.B.'s prescriptions after becoming aware W.B. had stolen another patient's Xanax.

42. On October 16, 2018, and October 22, 2018, respectively, GHEARING wrote W.B. prescriptions for Xanax (1 MG) and Percocet (7.5 MG). W.B. filled the prescriptions.

43. On November 15, 2018, GHEARING ordered W.B. into the medical practice for a pill count and a drug screen. When W.B. did not show up, he directed staff that no more narcotics should be prescribed. This is corroborated by emails between GHEARING and medical practice staff. Despite that fact, GHEARING prescribed more narcotics to W.B. less than one month later.

9

44. On December 3, 2018, GHEARING prescribed W.B. more Xanax (1 MG). On December 10, 2018 and December 13, 2018, GHEARING prescribed W.B. Percocet (7.5 MG and 5 MG, respectively). W.B. filled the prescriptions.

45. On January 14, 2019, GHEARING again ordered W.B. into the medical practice for a pill count and a drug screen.

46. On January 15, 2019, medical practice employees alerted GHEARING that W.B. had been in the hospital recently for a Xanax overdose. This is corroborated by emails between GHEARING and medical practice staff.

47. On January 29, 2019, W.B. refilled more Xanax (1 MG), previously written by GHEARING. On January 31, 2019 and February 4, 2019, GHEARING prescribed W.B. Percocet (5 MG and 5 MG, respectively). W.B. filled the prescriptions.

48. During this current investigation, a medical expert retained by the United States reviewed W.B.'s medical record from GHEARING's medical practice and concluded the prescriptions were not written for a legitimate purpose in the usual course of professional practice.

49. I have probable cause to believe that GHEARING distributed controlled substances to W.B. by writing a prescription for Percocet (Oxycodone-Acetaminophen), a Schedule II controlled substance, on February 4, 2019, because the prescription was not written for a legitimate medical purpose and was outside the usual course of professional practice.

50. Based on my training, experience, my involvement in this ongoing investigation, and information provided to me by others involved in this investigation, I believe **GHEARING** has violated Title 21 U.S.C. § 841(a)(1). Specifically, I have probable cause to believe that he intentionally, unlawfully, and without lawful authority, distributed a mixture and substance containing detectable amounts of controlled substances, specifically, Percocet (Oxycodone-

Acetaminophen), Schedule II controlled substances, without a legitimate medical purpose and outside the usual course of professional practice, to D.G. on or about January 21, 2019, and to W.B. on or about February 4, 2019, both in the Middle District of Tennessee.