FILED
U.S. DISTRICT COURT
MIDDLE DISTRICT OF TENN.

OCT 17 2022

DEPUTY CLERK

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

UNITED STATES OF AMERICA )
)                          No.    2:19-CR-00010
v.                                          )
)                          18 U.S.C. § 2
)                          18 U.S.C. § 1347
)                          18 U.S.C. § 1503
)                          18 U.S.C. § 1519
)                          21 U.S.C. § 841(a)(1)
)
GILBERT R. GHEARING )

# SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES:

## Introduction

At all times material to this Indictment:

1. **GILBERT R. GHEARING** was a physician licensed by the State of Tennessee Department of Health, Board of Examiners under license number 16838 on January 24, 1986, and was licensed to practice medicine in the State of Tennessee.

2. The Controlled Substances Act, 21 U.S.C. §§ 801, *et seq.*, regulated the manufacture, distribution, dispensation and use of drugs. Drugs, referred to in the Act as "controlled substances," were listed in schedules based upon the drug's medical use, potential for abuse, safety, and risk of dependence.

   (A)    Controlled substances in Schedule II were drugs that have a currently accepted medical use, or a use with severe restrictions, but also had a high potential for abuse, and abuse of the drug could lead to severe psychological or physical dependence.

(B)     Controlled substances in Schedule III were drugs which had a currently accepted medical use and had less potential for abuse than the drugs or other substances in schedules I and II, but abuse of the drug could lead to moderate or low physical dependence or high psychological dependence.

(C)     Controlled substances in Schedule IV were drugs which had a currently accepted medical use and had a low potential for abuse relative to controlled substances in Schedule III, but abuse could lead to limited physical dependence or psychological dependence.

3.      As part of his practice, **GILBERT R. GHEARING** prescribed controlled substances, including opioids, benzodiazepines, and muscle relaxers with his Drug Enforcement Administration ("DEA") registration under DEA Number BG8284907.

4.      **GILBERT R. GHEARING** operated a medical clinic known as Ghearing MD, Family Medicine and Obstetrics at 151 McArthur Ave, Celina, Tennessee 38551, and at a clinic located at 100 S Duncan St, Jamestown, Tennessee 38556. Until on or about mid-2016, he also operated a clinic located at 100 Old Jefferson St., Celina, Tennessee 38551.

5.      **GILBERT R. GHEARING** accepted cash-paying patients, and insurance patients, including private insurance and public insurance, such as Medicare and Medicaid.

Background on Medicare and TennCare

6.      The United States Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS"), was an agency of the United States that administered the Medicare and Medicaid programs. Medicare was a federally funded health insurance program that provided insurance coverage for persons aged 65 or over and to persons under the age of 65 who are entitled to benefits due to disability. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

2

7. Typically, a Medicare beneficiary enrolled in a Medicare Part D plan would fill their prescription at a pharmacy utilizing their Medicare Part D plan coverage to pay for the prescription. The pharmacy would then submit the prescription claim for reimbursement to the Medicare Part D beneficiary's plan for payment under the beneficiary's Health Insurance Claim Number and/or Medicare Plan identification number.

8. Medicare required of its providers, among other things, that all drugs prescribed or issued be medically necessary, that is, "reasonable and necessary" for the diagnosis and treatment of an illness or injury. Medicare claim forms, for example, required the provider who made a claim for services to certify that the services were "medically indicated and necessary for the health of the patient."

9. For a drug to have been covered and reimbursable under the Medicare program, the drug must have been prescribed by a physician who was treating the Medicare enrollee within the scope of the physician's license, and must be required in order to diagnose or treat the patient's medical condition, and must be safe and effective.

10. TennCare was Tennessee's Medicaid program and was administered pursuant to Title XIX of the Social Security Act. TennCare was also a health care benefit program as defined by Title 18, United States Code, Section 24(b).

11. TennCare was a joint program between the State of Tennessee and the United States of America, with approximately thirty (30) percent of the funding coming from the State of Tennessee and the remaining approximate seventy (70) percent coming from the United States federal government. TennCare served indigent people who could not afford health care insurance and uninsured or uninsurable people.

12. TennCare contracted with private insurance companies to provide insurance services to eligible persons. Each of those private insurance companies was referred to as a

3

managed care company ("MCC"). Each MCC contracted with medical service providers to render services to the enrollees. The medical service providers submitted claims to the MCC, on behalf of the enrollee, and received compensation based on those claims.

13. For TennCare pharmacy claims, the state assumed the financial responsibility of drugs. Through TennCare, the state contracted with a "Pharmacy Benefits Manager" ("PBM"), which actually paid the pharmacies. TennCare's PBM was called Magellan. For each drug, the PBM processed and reimbursed pharmacy providers for all claims from TennCare enrollees. TennCare, through the PBM, paid funds directly to retail pharmacies that in turn dispensed prescription medications to the TennCare recipient. The TennCare prescription program operated on a claim-for-service basis.

14. TennCare required of its providers, among other things, that all drugs prescribed or issued must have been "medically necessary," that is, prescribed by a physician who was treating the TennCare enrollee within the scope of the physician's license, and must be required in order to diagnose or treat the patient's medical condition, and must be safe and effective.

15. **GILBERT R. GHEARING** signed contracts with TennCare's MCCs. The contracts required that **GILBERT R. GHEARING** only order medically necessary items and services for TennCare enrollees. The contracts also required that **GILBERT R. GHEARING** maintain medical records for TennCare enrollees, and maintain original medical records during any pending investigation or prosecution until the conclusion of the investigation or prosecution.

16. Prescriptions for controlled substances issued by **GILBERT R. GHEARING** to patients were presented by patients to pharmacies, and pharmacies submitted claims for payment for the controlled substances to Medicare Part D health plans, or to TennCare through Magellan, for reimbursement and payment.

17. Oxycodone was a narcotic, a Schedule II controlled substance, and was marketed commonly as OxyContin, and Percocet, when it also contained Acetaminophen.

18. Alprazolam was a benzodiazepine, a Schedule IV controlled substance, and was marketed commonly as Xanax.

19. Clonazepam was a benzodiazepine, a Schedule IV controlled substance, and was marketed commonly as Klonopin.

20. Carisoprodol was a muscle relaxer, a Schedule IV controlled substance, and was marketed commonly as Soma.

The Scheme to Defraud

21. From as early as September 2016, and continuing thereafter until on or about February, 2019, in the Middle District of Tennessee, **GILBERT R. GHEARING**, aided and abetted by others known and unknown to the Grand Jury, knowingly and willfully devised and participated in a scheme and artifice to defraud health insurance benefit programs, including Medicare and TennCare, in connection with the delivery of and payment for health care benefits, items, and services.

22. It was the general purpose of the scheme and artifice for **GILBERT R. GHEARING** to cause others known and unknown to the Grand Jury to submit materially false and fraudulent claims to Medicare and TennCare, for payment for dispensed controlled substance prescriptions that were not medically necessary, including on behalf of Medicare beneficiary R.C. and TennCare beneficiaries J.H., K.W., O.K., W.B., and D.G, knowing and intending that Medicare and TennCare would pay such false and fraudulent claims.

23. It was part of the scheme that **GILBERT R. GHEARING** would prescribe controlled substances to patients without sufficient medical necessity for the prescription of controlled substances.

5

24. It was further part of the scheme that **GILBERT R. GHEARING** would prescribe excessive and inappropriate quantities and combinations of controlled substances to patients outside the usual course of professional practice.

25. It was further part of the scheme that **GILBERT R. GHEARING** would prescribe combinations of controlled substances to patients but failed to monitor the use and abuse of the prescribed controlled substances by the patients.

26. It was further part of the scheme that **GILBERT R. GHEARING** would continue to prescribe controlled substances notwithstanding prior overdoses by patients.

27. It was further part of the scheme that **GILBERT R. GHEARING** would continue to prescribe controlled substances to patients who had previously sought addiction treatment.

28. It was further part of the scheme that **GILBERT R. GHEARING** would continue to prescribe controlled substances notwithstanding the receipt of information by **GILBERT R. GHEARING** that patients abused their controlled substances, abused other substances, were addicted, and had stolen medications from other patients.

29. It was further part of the scheme that **GILBERT R. GHEARING** would prescribe controlled substances in quantities and combinations that would cause patients to abuse, misuse, and become addicted to the controlled substances.

30. It was further part of the scheme that **GILBERT R. GHEARING** would prescribe controlled substances to patients knowing that the patients were addicted to and were misusing the controlled substances and were requesting additional quantities of controlled substances for the patients' drug habit.

31. It was further part of the scheme that **GILBERT R. GHEARING** would continue to prescribe controlled substances notwithstanding patients exhibiting signs of intoxication while in his medical clinic.

32. It was further part of the scheme that **GILBERT R. GHEARING** would fail to drug screen certain patients.

33. It was further part of the scheme that **GILBERT R. GHEARING** would fail to permanently discharge patients after certain patients tested positive on drug screens for illegal substances and non-prescribed controlled substances.

34. It was further part of the scheme that **GILBERT R. GHEARING** would fail to permanently discharge certain patients who tested negative on drug screens for their prescribed controlled substances.

35. It was further part of the scheme that **GILBERT R. GHEARING** would fail to permanently discharge patients after certain patients failed to show up to the medical clinic for pill counts.

36. It was further part of the scheme that **GILBERT R. GHEARING** ignored warnings about prescribing combinations of controlled substances.

37. It was further part of the scheme that **GILBERT R. GHEARING** would bill Medicare and TennCare for the patient visits to his clinic where they obtained controlled substance prescriptions.

38. It was further part of the scheme that **GILBERT R. GHEARING** would cause his patients to fill prescriptions for controlled substances at A.H.P., the pharmacy located next door to his clinic at 151 McArthur Ave, Celina, Tennessee 38551.

39. It was further part of the scheme that **GILBERT R. GHEARING** owned the building at 151 McArthur Ave, Celina, Tennessee 38551, and leased space to A.H.P.

40. It was further part of the scheme that **GILBERT R. GHEARING** received financial benefits from A.H.P.

41. It was further part of the scheme that **GILBERT R. GHEARING** referred patients, including TennCare and Medicare patients, to A.H.P.

42. It was further part of the scheme that **GILBERT R. GHEARING** would cause A.H.P. to submit claims to TennCare and Medicare for payment and reimbursement of controlled substance prescriptions written by **GILBERT R. GHEARING** and dispensed by A.H.P.

43. It was further part of the scheme that **GILBERT R. GHEARING**, and others known and unknown to the Grand Jury, would require patients, including Medicare and TennCare beneficiaries to return for frequent visits to obtain additional prescriptions for controlled substances.

<u>The Offenses</u>

44. Paragraphs 1 through 43, above, are re-alleged and incorporated by reference as though fully set forth herein.

45. On or about the dates set forth in each count below, in the Middle District of Tennessee, **GILBERT R. GHEARING**, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is TennCare and Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises money and property owned by, and under the custody and control of, said health care benefit programs.

46. In furtherance of the scheme, **GILBERT R. GHEARING** did cause a pharmacy to submit claims for the dispensing of controlled substance prescriptions issued by **GILBERT R. GHEARING** to the patients listed below. The prescriptions were not medically necessary because they were not issued for a legitimate medical purpose within the usual course of professional

8

practice. Thus, the prescriptions were not authorized for the pharmacy to obtain reimbursement

for such services, and the claims were false and fraudulent.

| Count | Patient | On or About Date Prescription Written | Drug | Schedule | On or About Claim Submitted | Claim Number | Paid by Health Care Benefit Program |
|---|---|---|---|---|---|---|---|
| 1 | RC | September 12, 2016 | Oxycodone (Oxycontin) | II | September 12, 2016 | 366567533591 0000505836792 | Medicare |
| 2 | RC | September 22, 2016 | Alprazolam (Xanax) | IV | September 22, 2016 | 366666016941 0000506059238 | Medicare |
| 3 | RC | September 22, 2016 | Carisoprodol (Soma) | IV | September 22, 2016 | 366664363761 0000506059238 | Medicare |
| 4 | RC | September 22, 2016 | Oxycodone (Oxycontin) | II | September 23, 2016 | 166677000191 0000506059238 | Medicare |
| 5 | RC | October 10, 2016 | Carisoprodol (Soma) | IV | October 10, 2016 | 366849782061 0000506333256 | Medicare |
| 6 | RC | October 10, 2016 | Oxycodone (Oxycontin) | II | October 10, 2016 | 366843084011 0000506333256 | Medicare |
| 7 | RC | October 21, 2016 | Oxycodone (Oxycontin) | II | October 21, 2016 | 366953822811 0000506590020 | Medicare |
| 8 | RC | November 3, 2016 | Oxycodone (Oxycontin) | II | November 3 2016 | 367089661951 0000506858542 | Medicare |
| 9 | RC | November 3, 2016 | Alprazolam (Xanax) | IV | November 9, 2016 | 167142820601 0000506858542 | Medicare |
| 10 | RC | November 3, 2016 | Carisoprodol (Soma) | IV | November 9, 2016 | 167147763051 0000506858542 | Medicare |
| 11 | RC | December 6, 2016 | Oxycodone | II | December 6, 2016 | 467419233231 0000509937404 | Medicare |
| 12 | RC | December 6, 2016 | Alprazolam (Xanax) | IV | December 8, 2016 | 167433913831 0000509937404 | Medicare |
| 13 | RC | December 6, 2016 | Carisoprodol (Soma) | IV | December 8, 2016 | 167432288751 0000509937404 | Medicare |
| 14 | RC | December 22, 2016 | Alprazolam (Xanax) | IV | December 22, 2016 | 367570713681 0000510753187 | Medicare |
| 15 | RC | December 22, 2016 | Oxycodone | II | December 22, 2016 | 367572358651 0000510753187 | Medicare |
| 16 | JH | January 6, 2017 | Oxycodone-Acetaminophen (Percocet) | II | January 6, 2017 | 00014037038101 -000 | TennCare |
| 17 | JH | March 13, 2017 | Oxycodone-Acetaminophen (Percocet) | II | March 13, 2017 | 00014685894401 -000 | TennCare |

| 18 | KW | August 8, 2017 | Oxycodone-Acetaminophen (Percocet) | II | August 8, 2017 | 00016047940601 -000 | TennCare |
|---|---|---|---|---|---|---|---|
| 19 | KW | September 5, 2017 | Oxycodone-Acetaminophen (Percocet) | II | September 5, 2017 | 00016304623301 -000 | TennCare |
| 20 | KW | October 16, 2017 | Oxycodone-Acetaminophen (Percocet) | II | October 16, 2017 | 00016697600701 -000 | TennCare |
| 21 | OK | September 4, 2017 | Oxycodone-Acetaminophen (Percocet) | II | September 4, 2017 | 00016293014201 -000 | TennCare |
| 22 | OK | September 26, 2017 | Oxycodone-Acetaminophen (Percocet) | II | September 26, 2017 | 00016504388101 -000 | TennCare |
| 23 | OK | October 13, 2017 | Oxycodone-Acetaminophen (Percocet) | II | October 13, 2017 | 00016677822701 -000 | TennCare |
| 24 | WB | July 17, 2018 | Oxycodone-Acetaminophen (Percocet) | II | July 17, 2018 | 00019305299701 -000 | TennCare |
| 25 | WB | January 31, 2019 | Oxycodone-Acetaminophen (Percocet) | II | January 31, 2019 | 00021162874701 -000 | TennCare |
| 26 | DG | August 16, 2018 | Oxycodone-Acetaminophen (Percocet) | II | August 16, 2018 | 00019571964901 -000 | TennCare |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNTS TWENTY-SEVEN THROUGH SIXTY-ONE

THE GRAND JURY FURTHER CHARGES:

47.    Paragraphs 1 through 46, are re-alleged and incorporated by reference as though fully set forth herein.

48.    Beginning not later than September 2016, and continuing thereafter until on or about February 2019, in the Middle District of Tennessee, **GILBERT R. GHEARING** did knowingly and intentionally and without authority distribute and dispense a mixture and substance

containing a detectable amount of the Schedule II and Schedule IV controlled substances listed

below, without a legitimate medical purpose and outside the usual course of professional practice.

| Count | Patient | On or About Date Prescription Written | Drug | Schedule |
|---|---|---|---|---|
| 27 | RC | January 3, 2017 | Carisoprodol (Soma) | IV |
| | | | Alprazolam (Xanax) | IV |
| 28 | RC | January 24, 2017 | Oxycodone | II |
| | | | Carisoprodol (Soma) | IV |
| 29 | RC | February 6, 2017 | Oxycodone | II |
| 30 | OK | September 15, 2017 | Oxycodone-Acetaminophen (Percocet) | II |
| 31 | OK | September 21, 2017 | Clonazepam (Klonopin) | IV |
| 32 | WB | November 3, 2017 | Alprazolam (Xanax) | IV |
| 33 | WB | October 16, 2018 | Alprazolam (Xanax) | IV |
| 34 | WB | October 22, 2018 | Oxycodone-Acetaminophen (Percocet) | II |
| 35 | WB | December 3, 2018 | Alprazolam (Xanax) | IV |
| 36 | WB | December 10, 2018 | Oxycodone-Acetaminophen (Percocet) | II |
| 37 | WB | December 13, 2018 | Oxycodone-Acetaminophen (Percocet) | II |
| 38 | WB | January 7, 2019 | Oxycodone-Acetaminophen (Percocet) | II |
| 39 | WB | February 4, 2019 | Oxycodone-Acetaminophen (Percocet) | II |
| 40 | DG | February 7, 2017 | Clonazepam (Klonopin) | IV |
| 41 | DG | May 1, 2017 | Clonazepam (Klonopin) | IV |

| | | | | |
|---|---|---|---|---|
| 42 | DG | September 6, 2018 | Clonazepam (Klonopin) | IV |
| | | | Oxycodone-Acetaminophen (Percocet) | II |
| 43 | DG | January 21, 2019 | Oxycodone-Acetaminophen (Percocet) | II |
| 44 | JH | February 2, 2017 | Oxycodone-Acetaminophen (Percocet) | II |
| 45 | JH | February 27, 2017 | Clonazepam (Klonopin) | IV |
| | | | Carisoprodol (Soma) | IV |
| 46 | JH | March 27, 2017 | Clonazepam (Klonopin) | IV |
| | | | Carisoprodol (Soma) | IV |
| | | | Oxycodone-Acetaminophen (Percocet) | II |
| 47 | JH | May 15, 2017 | Clonazepam (Klonopin) | IV |
| | | | Carisoprodol (Soma) | IV |
| | | | Oxycodone-Acetaminophen (Percocet) | II |
| 48 | JH | July 7, 2017 | Oxycodone-Acetaminophen (Percocet) | II |
| 49 | JH | July 25, 2017 | Clonazepam (Klonopin) | IV |
| | | | Carisoprodol (Soma) | IV |
| 50 | JH | August 16, 2018 | Oxycodone-Acetaminophen (Percocet) | II |

| | | | | |
|---|---|---|---|---|
| 51 | KW | April 12, 2017 | Alprazolam (Xanax) | IV |
| | | | Oxycodone-Acetaminophen (Percocet) | II |
| 52 | KW | July 10, 2017 | Alprazolam (Xanax) | IV |
| | | | Oxycodone-Acetaminophen (Percocet) | II |
| 53 | KW | September 22, 2017 | Oxycodone-Acetaminophen (Percocet) | II |
| 54 | KW | September 29, 2017 | Oxycodone-Acetaminophen (Percocet) | II |
| 55 | KW | December 1, 2017 | Oxycodone-Acetaminophen (Percocet) | II |
| 56 | KW | December 28, 2017 | Alprazolam (Xanax) | IV |
| 57 | PP | February 27, 2018 | Oxycodone-Acetaminophen (Percocet) | II |
| 58 | PP | July 31, 2018 | Carisoprodol (Soma) | IV |
| 59 | PP | August 7, 2018 | Oxycodone-Acetaminophen (Percocet) | II |
| 60 | PP | August 14, 2018 | Oxycodone-Acetaminophen (Percocet) | II |
| 61 | PP | August 20, 2018 | Oxycodone-Acetaminophen (Percocet) | II |
| | | | Alprazolam (Xanax) | IV |

All in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

<u>COUNT SIXTY-TWO</u>

THE GRAND JURY FURTHER CHARGES:

49.     Paragraphs 1 through 48, are re-alleged and incorporated by reference as though fully set forth herein.

50.     On June 12, 2019, a federal grand jury in the Middle District of Tennessee returned an Indictment charging **GILBERT R. GHEARING** with twenty-six counts of Health Care Fraud, 18 U.S.C. § 1347, and thirty-five counts of Drug Distribution, 21 U.S.C. § 841(a)(1), related to the prescribing of controlled substances to the seven patients named in the Indictment.

51.     On July 18, 2019, the Court set a trial on the Indictment to begin on April 21, 2020.

52.     In December 2019 through January 2020, while under continued criminal investigation, and while a trial on the Indictment was set to begin on April 21, 2020, **GILBERT R. GHEARING** logged into the electronic medical records system containing the medical records for the seven patients named in the Indictment and did alter the patient medical records, including adding medical histories, diagnosis codes, examinations, assessments, and treatment notes.

53.     On July 22, 2021, with the trial scheduled to begin on September 7, 2021, at a Court hearing and in the presence of **GILBERT R. GHEARING**, the United States stated its intention to obtain the electronic medical records for the seven patients from the electronic medical records company to use as a joint exhibit for trial and for the prosecution and defense experts to review.

54.     On October 26, 2021, the electronic medical records company provided the medical records for the seven patients to the United States.  The medical records contained the alterations made by **GILBERT R. GHEARING** in December 2019 through January 2020, after the Indictment was returned on June 12, 2019.

55.     On or about December 29, 2021, **GILBERT R. GHEARING** disclosed to the United States his intent to call a compliance expert to testify at trial and provided a written

14

summary of the scope of the expert testimony, to include expert opinions on **GILBERT R. GHEARING**'s medical record documentation practices. The expert's opinions were based on the expert's review of **GILBERT R. GHEARING**'s medical practice and records. **GILBERT R. GHEARING** did not disclose to the United States that he had altered the medical records of the seven patients named in the Indictment.

56. On July 29, 2022, five weeks before the scheduled trial date of September 6, 2022, **GILBERT R. GHEARING** disclosed to the United States his intent to call a medical expert to testify at trial in defense of **GILBERT R. GHEARING**'s prescribing practices as to the seven patients in the Indictment, and disclosed an expert report written by the testifying medical expert related to the expert's review of the medical records for the seven patients. The expert report relied on the medical records altered by **GILBERT R. GHEARING** after Indictment, and included citations to additions and alterations made to the records by **GILBERT R. GHEARING** in December 2019 through January 2020. **GILBERT R. GHEARING** did not disclose to the United States that he had altered the medical records of the seven patients named in the Indictment.

57. Beginning on or about December 2019, and continuing until on or about August 2022, in the Middle District of Tennessee, the defendant, **GILBERT R. GHEARING**, did corruptly endeavor to influence, obstruct, and impede the due administration of justice in a pending criminal case set for trial in the Middle District of Tennessee, as described in Paragraphs 50 through 56.

All in violation of Title 18, United States Code, Section 1503.

COUNT SIXTY-THREE

THE GRAND JURY FURTHER CHARGES:

58. Paragraphs 1 through 57, are re-alleged and incorporated by reference as though fully set forth herein.

59.     Between on or about December 26, 2019, and on or about January 3, 2020, in the Middle District of Tennessee, the defendant, **GILBERT R. GHEARING**, did knowingly alter, falsify, and make a false entry in a record and document, to wit: the medical records of the seven patients in the Indictment returned on June 12, 2019, with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, that is, a pending criminal case set for trial in the Middle District of Tennessee, and in relation to and in contemplation of such matter.

All in violation of Title 18, United States Code, Section 1519.

## FORFEITURE ALLEGATION

THE GRAND JURY FURTHER CHARGES:

60.     The allegations contained in the Indictment are re-alleged an incorporated by reference as if fully set forth in support of this forfeiture allegation.

61.     Upon conviction of Counts ONE THROUGH TWENTY-SIX (Health Care Fraud), **GILBERT R. GHEARING** shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7):

> (A)     Any property, real or personal, that constitutes, or is derived directly or indirectly, from gross proceeds traceable to the commission of the offense, including but not limited to the follow:
>
>> a. a money judgment in an amount to be determined representing the amount of proceeds **GILBERT R. GHEARING** obtained as a result of such offense.

62.     Upon conviction of Count(s) TWENTY-SEVEN through SIXTY-ONE (Unlawful Distribution of a Controlled Substance), **GILBERT R. GHEARING** shall forfeit to the United States of America, pursuant to Title 21, United States Code, Section 853:

(A)     Any property constituting, or derived from, any proceeds the defendant obtained, directly or indirectly, as a result of the offense; and

(B)     Any of the defendant's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the offense, including but not limited to the following:

a. a money judgment in an amount to be determined, representing the amount of proceeds **GILBERT R. GHEARING** obtained as a result of such offense and the value of any property used or intended to be used to commit or facilitate the commission of such offense.

## SUBSTITUTE PROPERTY

63.     If any of the property described above, as a result of any act or omission of **GILBERT R. GHEARING**:

(A)     cannot be located upon the exercise of due diligence.

(B)     has been transferred or sold to, or deposited with, a third party;

(C)     has been placed beyond the jurisdiction of the court;

(D)     has been substantially diminished in value; or

(E)     has been comingled with other property that cannot be divided without difficulty,

the United States shall be entitled to forfeiture of the substitute property, and it is the intent of the

United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any

other property of **GILBERT R. GHEARING** up the value of said property listed above as subject

to forfeiture.

A TRUE BILL

FOREPERSON

MARK H. WILDASIN
UNITED STATES ATTORNEY

SARAH K. BOGNI
JULIET ALDRIDGE
ASSISTANT UNITED STATES ATTORNEYS

18