IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 2:19-cr-00010 |
| v. | ) | |
| | ) | Judge Campbell |
| | ) | |
| GILBERT GHEARING | ) | |

## RESPONSE IN OPPOSITION TO MOTION TO SUPPRESS FOR VIOLATING THE FOURTH AMENDMENT, TO DISMISS FOR VIOLATING DUE PROCESS, OR FOR A *FRANKS* HEARING

The United States of America, by and through undersigned counsel, files this response in opposition to Defendant Gilbert Ghearing's "Motion to Suppress for Violating the Fourth Amendment, to Dismiss for Violating Due Process, or for a *Franks* Hearing." (DE# 239.) Ghearing's mid-trial motion seeks to exclude evidence that has already been admitted by the Court and presented to the jury. Alternatively, Ghearing asks for the extraordinary relief of dismissing the Superseding Indictment for a purported due process violation, and/or requests a mid-trial *Franks* hearing regarding possible suppression of the evidence.[1]

On March 9, 2023, after Amber Hall and Cheyenne Huddleston[2] both testified at trial, Ghearing filed the instant motion alleging that all evidence from the initial search warrant (Case No. 19-mj-2216, the "Premises Warrant") executed on February 8, 2019, as well as a subsequent

---

[1] At the outset, the Government notes that Ghearing's motion is improper because a motion to suppress evidence "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(C). While Ghearing did not receive unredacted Jencks material until trial, the information that is the basis for this motion was known to him well before the Court's deadline for pretrial motions expired.

[2] Cheyenne Tipton has since married and is now Cheyenne Huddleston. To avoid confusion, she will be referred to as Huddleston for purposes of this Response.

search warrant (Case No. 19-mj-2072, the "eCW Warrant") executed on March 14, 2019, must all be excluded.[3]

Ghearing does not explain why *all* evidence from the initial Premises Warrant must be excluded, other than alleging that two employees, Amber Hall and Charley Price, were instructed to sign into Dr. Ghearing's electronic medical record software (eClinicalWorks) utilizing his username and password and download the medical charts of patients. There is no basis for this allegation and the testimony of Amber Hall directly contradicts this assertion. Even assuming *arguendo* the assertion were true, that is no basis to suppress all evidence from the Premises Warrant; at most, it is an allegation that certain specific evidence was beyond the scope of the warrant[4] Additionally, in a hearing outside the presence of the jury during Cheyenne Huddleston's testimony, Mr. Chapman stated, "there are many administrative processes available to get ahold of these medical records. We don't seek suppression of medical records . . . ." (Huddleston Tr, P 2022.) As such, there is no basis for suppressing the medical records nor any of the physical or digital items seized during the Premises Warrant.

The real gravamen of Ghearing's motion relates to the inclusion of certain information in an affidavit for the eCW Warrant, which sought authorization to obtain electronic communications between Ghearing and staff from eClinicalWorks. Ghearing claims that Amber Hall and Cheyenne Huddleston acted as government agents when they conducted their own review of patient medical records in March 2019, subsequent to the execution of the Premises Warrant. Specifically, Ghearing argues that the information in Paragraph 70 of the affidavit in support of the eCW

---

[3] The applications and affidavits for both search warrants are attached to this Response as Attachments A and B respectively. The list of patients labeled Attachment D of the Premises Warrant has been omitted due to patient health information.

[4] Ghearing provides no analysis of this issue, nor does he address the independent source doctrine.

2

Warrant was provided based on employees accessing unauthorized information, and so should not have been included. Ghearing separately argues that Hall and Huddleston were essentially criminal "informants," and so the Government should have been required to assess their history of truthfulness. Ghearing also claims that the affidavit for the second warrant is misleading, and so is grounds for a *Franks* hearing and/or dismissal for a due process violation.

Ghearing also complains that the information from Hall and Huddleston's interviews was not fully laid out in DEA TFO Rebecca Wright's written reports or a subsequent search warrant affidavit authored by another agent.[5] From this, Ghearing's motion boldly asks this Court to exclude *all* evidence seized during the execution of the original Premises Warrant—though he does not explain why any of it is subject to exclusion, much less all of it (as noted above). (DE# 239, PageID #: 1652.) Ghearing also requests suppression of evidence from all subsequent searches, though he only specifically identifies the "subsequent search warrant [for] EclinicalWorks." (*Id.*) While the precise scope of Ghearing's suppression request is not entirely clear, as a practical matter, the Government believes the motion seeks to suppress Government Trial Exhibits that are excerpts of messages from the eClinicalWorks program. The motion thus requests suppression of numerous exhibits that have already been admitted and published to the jury during the course of trial. (*See* Trial Exhibits in the 402 – 611 range.)

Ghearing's motion is frivolous and this Court should deny it. As the record makes clear, there is no evidence that any contact was made between the government and Huddleston, Hall, or Price before the February 8, 2019, Premises Warrant, and therefore, any allegations of wrongdoing

---

[5] The Government acknowledges that (as with virtually any written summary) certain facts are not detailed in the documents. But the Government strongly disputes that this renders the documents false or that those facts were omitted with the intent to mislead.

do not support a motion to suppress that evidence. Further, Ghearing's motion does not identify any newly discovered information that excuses the failure to file a pretrial suppression motion.

Similarly, Ghearing's analysis regarding the subsequent eCW warrant fails to establish his entitlement to any relief. Even worse, Ghearing's motion misrepresents the factual record. Indeed, the sworn testimony from Hall and Huddleston directly contradicts many of the assertions by defense counsel. The "searches" in March 2019 by Hall and Huddleston were not instigated, encouraged, or participated in by law enforcement. It is insufficient that the Government acquiesced to, or was aware of, their conduct—law enforcement agents must have initiated or directed the search for it to constitute government action. As such, there was no agency relationship and no government action.

Moreover, even if Hall and Huddleston were deemed to have conducted a search as "government agents," the specific information obtained from the (allegedly) unlawful searches can be excised from the affidavit. The remaining factual basis is still more than sufficient evidence to establish probable cause for the eClinicalWorks warrant. As a result, suppression of the evidence from the eClinicalWorks search warrant still would not be appropriate. Similarly, Ghearing is not entitled to a *Franks* hearing because he has not and cannot make the substantial preliminary showing required for one.

Finally, there has been no government misconduct. That much is clear when the Court looks to the actual evidentiary record (rather than the mischaracterizations of defense counsel). And there is certainly not any conduct that "shocks the conscience" to warrant consideration of a due process violation. Ghearing's motion should be rejected in its entirety.

4

As relevant to the instant motion, on February 7, 2019, DEA Special Agent Thomas Esslinger sought and was granted a premises search warrant for the clinic of Dr. Gilbert Ghearing located at 151 McArthur Avenue, Celina, Tennessee. (The Premises Warrant, Case No. 19-mj-2216.)

Employees of Ghearing's clinic who were present on February 8, 2019, were interviewed on site. As Amber Hall testified, she stopped assisting with the identification of patient records in order to be interviewed that day. (Hall Tr, P 1758.)[7] Cheyenne Huddleston was also interviewed that day. (Huddleston Tr, P 1962.) Neither were handcuffed nor detained.

FBI SA Brandon Bushkell and DEA Diversion Investigator Michael Galluzi interviewed Amber Hall. Hall was informed that she was free to end the interview and to leave at any time. HHS OIG Agent Fletcher Blalock interviewed Cheyenne Huddleston. As Huddleston testified, she was free to leave and in fact recalled leaving during the search warrant to get lunch for other employees. (*Id.*)

After the execution of the Premises Warrant, a number of employees both past and present were interviewed by law enforcement. TFO Wright attempted to contact Amber Hall via text message on February 14, 2019, and on several occasions thereafter with little to no response from

---

[6] Ghearing's motion presents a misleading recitation of the facts, and repeatedly mischaracterizes what witnesses testified to under oath. The Government has endeavored to correct the record and provide an accurate summary of the underlying events that form the basis of Ghearing's motion.

[7] The transcript of the testimony of Amber Hall has been filed as DE# 245, PageID #: 1675 – 1920 and the transcript of the testimony of Cheyenne Huddleston has been filed as DE# 246, PageID #: 1921 – 2075. Citations to these transcripts will be abbreviated as Hall Tr, P xxxx and Huddleston Tr, P xxxx.

5

Hall. On or about February 26, 2019, Hall was served with a subject letter.[8] On March 7, 2019, TFO Wright and another agent interviewed Hall at the Putnam County Sheriff's Office. Hall explained in her testimony that after the execution of the Premises Warrant on February 8, 2019, and after her interview on March 7, 2019, Hall subsequently viewed patient records—on her own initiative—to verify that the information she had given to law enforcement was accurate. (Hall Tr, P 1744-45, 1759, 1807-08, 1811, 1914.) This Court appears to have accepted Hall's testimony, finding her credible, and noted that there did not appear to be anything inappropriate, and that there was no attempt by law enforcement to "back door" a warrant. (Hall Tr, P 1814.)

Cheyenne Huddleston was also served with a subject letter on or about February 27, 2019. TFO Wright and another agent interviewed Huddleston on March 6, 2019, at the Putnam County Sheriff's Office. Huddleston also testified that she checked patient records on her own initiative and not at the direction of law enforcement. (Huddleston Tr, P 1991-92, 2073.) Notably, Huddleston made clear in her testimony that she did not review messages or emails in the eClinicalWorks system prior to her March 7, 2019, interview, but instead, had reviewed patient records. (*Id*. at Tr, P 2069-71.)   During both of their interviews, Hall and Huddleston were asked about different aspects of the ongoing investigation, as well as some specific patients that were of interest to law enforcement.

TFO Wright wrote reports detailing the interviews of both witnesses within a week after they occurred. Although detailed, these reports do not contain every word spoken by the witnesses, but rather TFO Wright's recall of information given by the witnesses that might be important to the investigation at the time. Contrary to Ghearing's claim in the motion, there is nothing false or

---

[8] Not, as has been suggested by the defense counsel throughout the trial, a target letter.

misleading about the reports, and at no point in either witnesses' testimony did the witnesses identify any factual errors.

TFO Wright's report of the March 6, 2019, interview of Cheyenne Huddleston did not contain a reference to notes furnished by Ms. Huddleston. However, TFO Wright did copy three pages of handwritten notes Ms. Huddleston brought to the interview and scanned them in as a part of the DEA case file. Unfortunately, however, the existence of Ms. Huddleston's handwritten notes was not known to undersigned counsel until after Ms. Huddleston testified that they existed.[9] The notes were disclosed to defense counsel promptly upon Ms. Huddleston's testimony and, in fact, while Ms. Huddleston was still in the midst of her testimony. Defense counsel had the opportunity to fully explore the contents of the notes[10] with the witness both outside the presence of and in the presence of the jury.

On March 14, 2019, DEA Agent Esslinger sought and was granted a search warrant for the messages of Ghearing and his staff contained within the eClinicalWorks system. (The eCW Warrant, Case No. 19-mj-2072.) These messages are considered stored electronic communications and fall within the protections of the Electronic Communications Privacy Act ("ECPA") 18 U.S.C. § 2703. In order to ensure compliance with ECPA, the United States took the extra step of seeking this search warrant for the stored communications, in addition to and separate from the Premises Warrant it had used to obtain documents and records from the clinic, including patient records.

---

[9] Counsel for the United States has explored this further. TFO Wright, in fact, had previously provided the Huddleston notes to the United States, but as the DEA6 report did not reference an attachment, and the scanned Huddleston notes had been inadvertently attached to the interview report rough notes, they were missed by the United States.

[10] The notes were admitted into evidence over government objection as Defense Exhibit 906. (Huddleston Tr, P 2041.)

## ARGUMENT

I. **There Is No Basis For Suppressing Evidence.**

    a. <u>The Government Did Not Initiate Or Direct An Unauthorized Search Of Patient Medical Records</u>

In order to establish Hall and Huddleston were acting as government agents, one prerequisite Ghearing must show is that the Government took affirmative steps to initiate or direct them to conduct the search. There is no such evidence here and the testimony directly contradicts this assertion.

The Fourth Amendment's protection against unreasonable searches and seizures only applies to government action, not the acts of private individuals. *Burdeau v. McDowell*, 256 U.S. 465, 475 (1921). The Fourth Amendment thus generally does not prohibit governmental use of information revealed to authorities by a confidant or third party. *United States v. Jacobsen*, 466 U.S. 109, 117 (1984). However, if a private individual acts as an agent or instrument of the government at the time of the search or seizure, the conduct is subject to the Fourth Amendment. *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971). The question, then, is whether a private party was acting in an agency relationship to the government when it engaged in the challenged conduct.

The Sixth Circuit's agency test requires courts to consider two factors in analyzing whether a private individual acted as an agent of the government at the time of a search: "1) the government's knowledge or acquiescence, and 2) the intent of the party performing the search." *United States v. Howard*, 752 F.2d 220, 227 (6th Cir. 1985) (quoting *United States v. Walther,* 652 F.2d 788, 792 (9th Cir.1981)). To establish an agency relationship, the defendant bears the burden of demonstrating by a preponderance of the evidence that (1) law enforcement "instigated, encouraged, or participated in the search," and (2) the private individual "engaged in the search

8

with the intent of assisting" law enforcement in investigative efforts. *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985). Only if a defendant meets both of these evidentiary requirements will the Fourth Amendment be applicable to the conduct of a private individual. *See id.* (concluding housekeeper was not agent because officers did not encourage or instigate search, even when searching party had requisite agent intent to aid law enforcement).

Ghearing has failed to carry his burden in relation to the first element—that the Government directed or initiated the search. To demonstrate law enforcement "instigated, encouraged, or participated" in the challenged search, a defendant must show more than the existence of antecedent contact, or even passive presence, by the government. *See United States v. Coleman*, 628 F.2d 961, 965 (6th Cir. 1980) (finding insufficient state involvement where antecedent contact was not directed toward a search); *United States v. Powell*, 836 F. App'x 391, 396 (6th Cir. 2020) (finding insufficient state involvement where police were assisting private individual in "passive, unengaged way" for safety, not investigatory, purposes); *compare United States v. Lichtenberger*, 19 F. Supp. 3d 753, 759 (N.D. Ohio 2014) (finding sufficient state participation where police actively directed individual through search of defendant's laptop), *with United States v. Benoit*, 713 F.3d 1, 10 (10th Cir. 2013) (finding insufficient state involvement where police passively viewed contents of defendant's laptop when presented by individual).

Where officials have not encouraged or instructed private individuals in a search, the Sixth Circuit has refused to find the first prong of the Court's agency theory test satisfied. *See, e.g., Lambert*, 771 F.2d at 89 (FBI never instructed or encouraged housekeeper's search of employer's home); *United States v. Robinson*, 390 F.3d 853, 872 (6th Cir. 2004) (DEA never instructed UPS worker to open package containing marijuana). Importantly, even if law enforcement officials knew of the search and failed to discourage the private individual's conduct, such evidence does

9

not satisfy the first prong of the agency theory test—so long as the search was initiated by the private individual. *See Powell*, 836 F. App'x at 393 (insufficient state involvement where police did not instruct but responded affirmatively when private individual asked whether they could search fridge of defendant's hotel room). As these cases make clear, a defendant must demonstrate affirmative steps by law enforcement to initiate or direct a private party's search.

Indeed, the cases in which the Sixth Circuit has found a private party to be a state agent have involved searches that were clearly initiated by law enforcement and carried out by private individuals following explicit direction from authorities. *See United States v. Hardin*, 539 F.3d 404, 420 (6th Cir. 2008) (officer urged apartment manager to enter defendant's home and search); *United States v. Foley,* 23 F.3d 408 (6th Cir. 1994) (per curiam) (officer instigated search by advising defendant's mother to pick up and open package)*; see also United States v. Gregory*, 497 F. Supp. 3d 243, 256 (E.D. Ky. 2020) (law enforcement actively sought out assistance of trash collector and accompanied individual in nonroutine trash pull); *Lichtenberger*, 19 F. Supp. 3d at 759 (officer directed defendant's girlfriend to boot up his computer and reveal illicit contents).

At issue here are private searches conducted by Hall and Huddleston in March 2019, following their initial interviews with law enforcement. While it is true that there was antecedent contact with law enforcement, that is insufficient to show that Hall and Huddleston's searches constituted state action because agents did not instigate or direct them to engage in the searches.

Both Hall and Huddleston testified repeatedly and unequivocally they were not directed by law enforcement to search for information or look at patient records. Hall testified she looked at patient records for the patients she "had spoken on" in order to verify that the information she had given was accurate. (Hall Tr, P 1807-08.) Huddleston stated that she looked at patient records and took notes on those specific patients because they were the patients that law enforcement had asked

10

about and she was trying to make sure the information that she gave was correct. (Huddleston Tr, P 2073.) She also testified that she did not look at emails or messages. (*Id*. at Tr, P 2069-71.) Based on both Hall and Huddleston's sworn testimony, the Court should conclude that law enforcement (including TFO Wright) did not improperly utilize either Hall or Huddleston as a governmental agent to instigate unauthorized searches.

### b. There Is No Basis For Ordering A *Franks* Hearing

Ghearing next argues that he should get a *Franks* hearing before ruling on his suppression request for the eCW Warrant because TFO Wright "misrepresented" information in her reports—that is, that the report failed to indicate that Huddleston used notes she had made while reviewing medical records to answer agents' questions. In other words, Ghearing claims TFO Wright's report failed to make clear that Huddleston was not providing the information solely from her memory. (DE# 239, PageID #: 1667.)

The availability of a *Franks* hearing is to challenge the validity of a search warrant *affidavit*. Ghearing is not entitled to a *Franks* hearing merely to criticize an agent and quibble over how thoroughly the agent's *report* summarizes an interview.[11] However, on that issue, the Government highlights two important details regarding TFO Wright's report. First, the omission of *how* the witnesses knew certain information does not render the report false—Huddleston *did* in fact provide the information that is described in the report and took the notes at issue in order to provide accurate information. And second, the failure to include a reference to Huddleston's notes does not inexorably lead to the conclusion that TFO Wright "purposefully acted in bad faith, intentionally falsifying and fabricating statements" in the hopes that other agents would then rely

---

[11] While Ghearing focuses on TFO Wright's *reports*, it is the *affidavit* for the search warrant that is at issue. TFO Wright was not the affiant for the search warrant; SA Esslinger was the affiant.

upon those purported fabrications, as Ghearing would suggest. (*Id.*, PageID #: 1663.)

As for the affidavit itself, an affidavit supporting a search warrant has a presumption of validity. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). To obtain a *Franks* hearing to challenge the validity of a warrant, the defendant must make a "substantial preliminary showing" that (1) the affidavit contained actual falsity, and that the falsity either was deliberate or resulted from reckless disregard for the truth, and (2) the allegedly false statement is necessary to the finding of probable cause. *Franks*, 438 U.S. at 155-56. A potential *Franks* violation thus requires a showing of intent— deliberate falsehood or reckless disregard for the truth. Conclusory attacks as to an affiant's intent are not sufficient to meet a substantial showing under *Franks*. Rather, to mandate a hearing, allegations "must be supported by more than a mere desire to cross-examine"; they must be accompanied by a detailed offer of proof. *Franks*, 438 U.S. at 171; *United States v. Stuart*, 507 F.3d 391, 396 (6th Cir. 2007). And, of course, the second element requires that the allegedly false statement was necessary to the finding of probable cause.

A *Franks* hearing normally is not available to challenge alleged omissions from an affidavit, because "except in the *very* rare case where the defendant makes a strong preliminary showing that the affiant *with an intention to mislead* excluded critical information from the affidavit, and the omission is critical to the finding of probable cause, *Franks* is inapplicable[.]" *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998) (emphasis in original). This is because an affidavit which omits a potentially exculpatory fact is "less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997). Indeed, "affidavits with potentially material omissions, while not immune from *Franks* inquiry, are much less likely to merit a *Franks* hearing than are affidavits including allegedly false statements. This court reasoned that allowing

12

omissions to be challenged would create a situation where almost every affidavit of an officer would be questioned." *Mays*, 134 F.3d at 815 (*citing Atkin*, 107 F.3d at 1217) (internal citations omitted). Accordingly, in alleged omission cases, the second prong of the *Franks* inquiry considers the affidavit—along with the omitted portions—to determine whether probable cause still exists. *United States v. Graham*, 275 F.3d 490, 506 (6th Cir. 2001) (*citing Atkin*, 107 F.3d at 1217).

When subjected to scrutiny, Ghearing's request for a *Franks* hearing fails for multiple reasons. Ghearing's theory, apparently, is that TFO Wright *knew* that Hall and Huddleston were acting at her direction as government agents, and that their searches were in violation the Fourth Amendment. And so, as his argument goes, because TFO Wright knew that they were violating the Fourth Amendment, TFO Wright therefore had to conceal the source of the information. The first problem with Ghearing's theory, however, is that his entire premise is flatly contradicted by the record—including Hall and Huddleston's sworn testimony on the matter. As discussed above, these employees were not acting at the direction of government agents—meaning that there was no Fourth Amendment violation. As a result, TFO Wright was fully entitled to use the information they provided, and TFO Wright's failure to document the basis of their information in a summary report does not evidence any intent to mislead—and it certainly does not mean the report (or the subsequent affidavit) was somehow false.

The information in SA Esslinger's affidavit is accurate—it simply does not note that Hall[12] and Huddleston's information was corroborated by medical records they had reviewed (rather than merely from their memory). But this actually constitutes a separate flaw in Ghearing's logic—this

---

[12] There is no evidence that law enforcement was aware Hall had gone back to confirm that what she had told law enforcement was accurate. Even if law enforcement was aware, it still would not change the result.

is not a situation where the omitted information contradicts what was included in the affidavit. If agents had included more details about the source and basis for Hall and Huddleston's information, it would have actually corroborated the information, thus strengthening the probable cause. As such, Ghearing cannot meet the standard for a *Franks* hearing because there was no intent to mislead, and even if the omitted information *were* considered, it only adds to the probable cause—it does not subtract from it.

Ghearing's motion further claims that the affidavit "falsely states Ghearing's employees explained to law enforcement agents that they have provided information and expressed concerns about Ghearing's controlled-substance prescriptions using the Subject Account, as recently as February 2019." (DE# 239, PageID #: 1655.) However, Ghearing does not give any explanation (much less evidence) for why this statement was false or that Agent Esslinger would have any reason to know the statement was supposedly false.

Even assuming *arguendo* that Hall and Huddleston's private searches were government action subject to the Fourth Amendment and that information should not have been relied upon in the affidavit, Ghearing's motion would still fail the second *Franks* prong. That is because the eCW Warrant was not based solely on the information obtained from the employees' searches. And if the Court were to excise the specific patient record information in Paragraph 70 from SA Esslinger's affidavit (i.e., the information obtained from the allegedly unauthorized searches), the affidavit still establishes probable cause.

The eCW Warrant affidavit summarized the entire investigation up to March 14, 2019, which provides probable cause for obtaining the inter-office communications of the Ghearing medical practice. Paragraph Sixty-Nine of the affidavit explains that the employees used the internal email / messaging system to communicate with Ghearing and each other about patients

14

and controlled-substances prescriptions. This is not information Hall or Huddleston would have gleaned from a search of patient records or business emails, but rather came from their personal knowledge of the clinic's operation and their (and other's) common practices for communicating. Paragraph Seventy contains general information that the employees used the messaging system to provide information and express concerns about Ghearing's controlled-substances prescriptions is likewise information that would have been known to Hall and Huddleston – and other employees - through their normal employment activities at the clinic rather than from a search of patient records or business emails.

Paragraph Seventy goes on to document specific instances of information Hall and Huddleston communicated to Ghearing through the messaging system as examples of instances where employees voiced concerns through the messaging system. This information is not necessary for a reviewing judge to have found probable cause to issue the eCW Warrant for the messages of the Ghearing clinic stored in the eClinicalWorks system. The information contained within the affidavit that the messaging system contains information about patients and controlled-substances prescriptions in conjunction with the detailed information about the investigation provides more than enough probable cause for the issuance of the eCW Warrant.

Thus, even without the challenged portion of the affidavit, Ghearing is not entitled to a *Franks* hearing because the Government's eCW Warrant was still supported by probable cause even without the allegedly unlawfully obtained information. Accordingly, Ghearing's motion independently fails for this reason.

      c. <u>Hall And Huddleston Were Not Criminal "Informants" For Whom The Government Was Required To Assess Credibility</u>

Contrary to Ghearing's baseless suggestion, the credibility or reliability of known citizen witnesses does not have to be proven for their information to be considered. "Statements from a

source named in a warrant application . . . are generally sufficient to establish probable cause without further corroboration because the legal consequences of lying to law enforcement officials tend to ensure reliability." *United States v. Lonnie Hodge,* 714 F.3d 380, 385 (6th Cir. 2013); *see also United States v. Miller,* 314 F.3d 265, 269–70 (6th Cir. 2002); *United States v. Pelham,* 801 F.2d 875, 878 (6th Cir. 1986). For this reason, statements of ordinary witnesses—such as victims and eyewitnesses of crimes—are entitled to a presumption of reliability and veracity without independent corroboration. *See United States v. Ingram*, 985 F.2d 562 (6th Cir. 1993) (citing *United States v. Phillips,* 727 F.2d 392, 397 (5th Cir. 1984); *United States v. Swihart,* 554 F.2d 264, 269 (6th Cir. 1977)).

There is simply no evidence that Hall and Huddleston were functioning as criminal or confidential informants. Indeed, the sworn testimony of both Hall and Huddleston make clear that they were not acting as informants when they were interviewed by law enforcement. Therefore, the United States was not required to establish their reliability, and so Ghearing's argument fails and does not even merit further discussion.

### d.   The eCW Warrant Was Obtained In Good Faith

Finally, the *United States v. Leon* good-faith exception applies and makes exclusion of the eCW Warrant an inappropriate remedy in this case. 468 U.S. 897 (1984). For the reasons set forth above, agents did not direct or instigate the private search by Hall and Huddleston—and so agents reasonably believed that the information they subsequently received was not obtained in violation of the Fourth Amendment. Accordingly, they had every reason to believe that they could rely upon that information—and that the source (whether from the witness's memory or the private search of medical records) was not a material one for purpose of obtaining the search warrant.

In *Leon*, the Supreme Court modified the exclusionary rule so as not to bar evidence seized

16

in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective. *Id.* The good-faith exception applies in all situations except (1) where the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing magistrate wholly abandoned his judicial role and failed to act in a neutral and detached fashion, serving merely as a rubber stamp for the police; (3) where the affidavit was nothing more than a "bare bones" affidavit that did not provide the magistrate with a substantial basis for determining the existence of probable cause, or where the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the officer's reliance on the warrant was not in good faith or objectively reasonable, such as where the warrant is facially deficient. *United States v. Rice*, 478 F.3d 704, 711-12 (6th Cir. 2007).

None of those situations is present here. While Ghearing argues that the first and last circumstances are present, the factual record belies Ghearing's claims, and there is no evidence to substantiate either ground here—for all of the reasons previously discussed above.

Thus, *Leon's* good faith exception should apply, as there is no deterrence value to excluding the evidence obtained pursuant to the warrants here. *See Davis*, 564 at 237. Evidence, even when unlawfully obtained, should be suppressed only if: (1) it would result in appreciable deterrence and (2) the deterrent value outweighs the social cost of ignoring reliable evidence bearing on the guilt of a dangerous criminal. *Id.* at 236-37. Accordingly, "[b]ecause the sole purpose of the exclusionary rule is to deter future Fourth Amendment violations, a criminal defendant seeking to suppress the fruits of a search must do more than demonstrate that the police violated the Fourth Amendment. He must show that suppressing the evidence will yield real deterrent value." *United States v. Justice*, 461 F. App'x 415, 417 (6th Cir. 2012) (internal quotations omitted). "[P]olice

17

conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States,* 555 U.S. 135, 144 (2009).

As discussed above, law enforcement did not instigate or direct employees to conduct an unlawful search. Both searches were conducted pursuant to search warrants approved by a federal judge. As such, agents exhibited neither deliberate, reckless, nor grossly negligent disregard for the defendant's Fourth Amendment rights, and there is no recurring or systemic negligence. *Davis* 564 U.S. at 238, 240. Any possible deterrent effect is thus far outweighed by the "substantial social costs exacted by the exclusionary rule." *See Krull*, 480 U.S. at 352–53. Law enforcement's actions followed the procedures contemplated by the Fourth Amendment in obtaining a warrant, and there is no reason to suppress the evidence from the second search warrant.[13]

## II.      **There Is No Due Process Violation Warranting Dismissal.**

The normal remedy for a Fourth Amendment violation is the exclusion of the evidence. For all the reasons discussed above, no such violation has occurred here. But that does not stop Ghearing. Ghearing proceeds to argue that the alleged Fourth Amendment violation is so flagrant that it amounts to "shocking" conduct that also violates the Fifth Amendment—and that it does not merely warrant suppression, but the complete dismissal of charges, with prejudice. Ghearing does not cite to any case dismissing an indictment for the conduct about which he complains.[14]

---

[13] The Government similarly contends that there is no basis to suppress the first search warrant. But because Ghearing fails to even offer a colorable basis for invalidating the original warrant, the Government focuses on the second search warrant.

[14] Defendant vaguely cites to the Health Insurance Portability and Accountability Act of 1996 (HIPAA) in alleging the United States may have made Huddleston and Hall "party to a crime." This is not true. Setting aside the fact that law enforcement never directed any of Defendant's staff to access records, there are many sections of the HIPAA law that allow for the disclosure of protected health information to law enforcement during investigations.   *See* 45 CFR § 164.512.

18

To assert a Fifth Amendment due process challenge, Ghearing must show that law enforcement's conduct was so egregious that it violates "that fundamental fairness, shocking to the universal sense of justice, mandated by the Due Process Clause." *See United States v. Russell*, 411 U.S. 423, 431-32 (1973) (internal quotation omitted) (explaining that "[w]hile we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes . . . the instant case is distinctly not of that breed"). As the Supreme Court has explained, due process challenges are reserved for conduct that truly "shocks the conscience." *See Rochin v. California*, 342 U.S. 165, 172 (1952) (finding due process violation where police, without a warrant, illegally forced entry in defendant's home, detained him, and subsequently instructed a doctor to inject defendant with a solution to force defendant to vomit evidence of crime).

Ghearing's due process argument fails because his Fourth Amendment rights have not been violated, and certainly not in a way that "shocks the conscience." *See, e.g., United States v. Napier*, 787 F.3d 333, 341-44 (6th Cir. 2015) (affirming court's denial of motion to dismiss because the alleged government conduct, even if inappropriate, did not rise "to the 'outrageous,' 'conscience shocking' level necessary to warrant the extraordinary remedy of dismissing the charges against him with prejudice"). Nonetheless, Ghearing complains that he could have directed his time, effort, and strategy differently if the Government also would have done certain things differently. But that complaint (even if true) is meaningless, and does not entitle him to any kind of relief.

"[I]n most criminal prosecutions, the *Brady* rule, Rule 16 and the Jencks Act, exhaust the universe of discovery to which the defendant is entitled." *United States v. Presser*, 844 F.2d 1275, 1285 n.12 (6th Cir. 1988). Even if Ms. Huddleston's notes did constitute *Brady*, which the United States does not concede, a due process violation has not occurred. The Sixth Circuit has made clear

19

that "[w]hen *Brady* material sought by a defendant is covered by the Jencks Act, 18 U.S.C. § 3500, the terms of that Act govern the timing of the government's disclosure." *United States v. Bencs*, 28 F.3d 555, 561 (6th Cir. 1994) (explaining that the Jencks Act overrides *Brady* with respect to the timing of disclosure, and that evidence properly disclosed after testimony at trial pursuant to the Jencks Act cannot be subject to earlier disclosure under *Brady*). "Put another way: the Jencks Act trumps *Brady* where impeachment evidence is Jencks Act material." *See United States v. Brazil*, 395 F. App'x 205, 215 (6th Cir. 2010); *United States v. Jones*, 612 F.2d 453, 455 (9th Cir. 1979) ("*Brady* does not overcome the strictures of the Jencks Act. When the defense seeks evidence which qualifies as both Jencks Act and *Brady* material, the Jencks Act standards control."). Indeed, the Sixth Circuit has repeatedly reaffirmed that the Jencks Act standard controls. *See, e.g., United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002) ("'When *Brady* material sought by a defendant is covered by the Jencks Act . . . the terms of that Act govern the timing of the government's disclosure.'") (quoting *Bencs*, 28 F.3d at 561); *Brazil*, 395 F. App'x at 215 (same); *Presser*, 844 F.2d at 1283 ("If impeachment evidence is within the ambit of the Jencks Act, then the express provisions of the Jencks Act control discovery of that kind of evidence.").

Ghearing does not identify any violation by the Government of its discovery obligations under Rule 16, *Brady*, or the Jencks Act. Simply put, Ghearing has failed to demonstrate that the Government has violated his rights and does not even come close to alleging "outrageous" government conduct that so shocks the conscience as to warrant dismissal of the indictment for a violation of due process.

20

## CONCLUSION

For the foregoing reasons, Ghearing's motion (DE# 239) should be denied.

Respectfully submitted,

THOMAS J. JAWORSKI
Attorney for the United States
Middle District of Tennessee
Acting Under Authority Conferred
by 28 U.S.C. § 515

By:    */s/ Juliet Aldridge*
Sarah K. Bogni
Juliet Aldridge
Amanda J. Klopf
Assistant United States Attorneys
719 Church Street, Suite 3300
Nashville, Tennessee 37203
Telephone:  615-736-5151

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2023, I electronically filed the foregoing with the clerk of court by using the CM/ECF system, which will send a notice of electronic filing to counsel for the defendant.

By:    */s/ Juliet Aldridge*
Juliet Aldridge
Assistant United States Attorney