# ATTACHMENT B

# UNITED STATES DISTRICT COURT

for the

Middle District of Tennessee

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 19-MJ-2072 |
| Information Associated with user ID Dr. Gilbert Ghearing and/or Dr. Gilbert Ghearing Family Medicine and that is Stored at Premises Controlled by eClinicalWorks | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ Massachusetts _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841 and 846 | Unlawful Dispensing of Controlled Substances and Conspiracy to Violate |
| 18 U.S.C. 1347 and 1349 | Health Care Fraud and Conspiracy to Violate; and Title 42 Anti-kickback Statute |
| 18 U.S.C. 1956 and 1957 | Money Laundering |

The application is based on these facts:

See attached Affidavit, at Attachment C pages 1-25.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Thomas D. Esslinger, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 03/14/2019

_____
*Judge's signature*

City and state: Nashville, Tennessee

Judge Jeffrey S. Frensley, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with Dr. Gilbert Ghearing and/or Dr. Gilbert Ghearing Family Medicine and Obstetrics and/or GhearingMD, located at 151 McArthur Avenue, Celina, TN 38551, and 100 Old Jefferson Street, Celina, TN 38551, User Key: 24569219-9a70-4aba-9166-2f99c44b4dca, APU No: 32197, licensed to Ghearing, Gilbert R., M.D. that is stored at premises owned, maintained, controlled, or operated by eClinicalWorks, an online file storage services provider headquartered at 2 Technology Dr, Westborough, MA 01581, USA.

# ATTACHMENT B

## Particular Things to be Seized

### I. Information to be disclosed by eClinicalWorks

To the extent that the information described in Attachment A is within the possession, custody, or control of eClinicalWorks, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or information that have been deleted but are still available to eClinicalWorks, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), eClinicalWorks is required to disclose the following information to the government for the account or identifier listed in Attachment A:

From January 1, 2016 to the present, all records pertaining to communications, including emails and instant messages, between or among the users of the account.

eClinicalWorks is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

### II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 and Title 18, United States Code, Sections 1347, 1349, 1956 and 1957, and Title 42, United States Code, Section 1320a-7(b), involving Gilbert Ghearing, M.D., since January 1, 2016, including, for the account or identifier listed on Attachment A.

## ATTACHMENT C

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

Your affiant Tom Esslinger, being duly sworn, deposes and states as follows:

## IDENTITY AND EXPERIENCE OF AFFIANT

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of Title 21 of the United States Code, who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 21.  I am presently employed as a Special Agent ("SA") for the United States Drug Enforcement Administration ("DEA"), and have been so employed for approximately fourteen years.  In that role, I am responsible for investigating crimes that involve unlawful importation and exportation of controlled substances, the possession with the intent to distribute controlled substances, the distribution of controlled substances, the use of communication facilities to further these offenses, as well as the related laundering of monetary instruments, in violation of Title 21, United States Code, Sections 841 (Illegal Distribution and Dispensing of Controlled Substances), 846 (Conspiracy to Distribute and Dispense Controlled Substances); and violations of Title 18, United States Code, Sections 1347 (Health Care Fraud), 1349 (Conspiracy to Commit Healthcare Fraud), 1956 and 1957 (Money Laundering), and Title 42, United States Code, Section 1320a-7(b) (Anti-Kickback Statute).   I am currently assigned to the Nashville District Office – Tactical Diversion Squad.  The Tactical Diversion Squad is tasked solely with the investigation of the illegal trafficking of pharmaceutical controlled substances.

2.      I have specialized training and experience in narcotics trafficking, conspiracy, and distribution investigations.  I have participated in all aspects of drug investigations, including the use of confidential sources and undercover officers, physical surveillance, electronic surveillance, the execution of search and arrest warrants, the use of court-ordered intercepts of electronic

communications, investigative interviews, the arrests of drug traffickers, and the analysis of seized records, physical evidence, and taped conversations. I have spoken on numerous occasions with other experienced narcotics investigators concerning the methods and practices of drug traffickers. In addition, I have consulted with physicians as expert witnesses, reviewed prescription records and patient medical files, and have spoken with witnesses having extensive knowledge of pharmaceuticals and the methods and practices of individuals trafficking in or diverting pharmaceutical controlled substances.

3. Through my investigations, my training and experience, and my conversations with other law enforcement personnel, I have become familiar with the tactics and methods used by traffickers to smuggle and safeguard pharmaceutical controlled substances, to distribute and divert pharmaceutical controlled substances, and to collect and launder the proceeds from the sale of controlled substances. Further, I am aware of the tactics and methods employed by pharmaceutical trafficking organizations and individuals to thwart investigation of their illegal activities.

## PURPOSE OF THE AFFIDAVIT AND TARGET LOCATION

4. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the eClinicalWorks user account of Dr. Gilbert Ghearing ("GHEARING") and/or Dr. Gilbert Ghearing Family Medicine and Obstetrics and/or GhearingMD, located at 151 McArthur Avenue, Celina, TN 38551 (the "Medical Office"), and 100 Old Jefferson Street, Celina, TN 38551, User Key: 24569219-9a70-4aba-9166-2f99c44b4dca, APU No: 32197, licensed to Ghearing, Gilbert R., M.D., and in the possession, custody, or control of eClinicalWorks ("SUBJECT ACCOUNT").

5. Based on my training, experience, and facts as set forth in this Affidavit, there is probable cause to believe that GHEARING, and others known and unknown to the investigation, have committed violations of Title 21, United States Code, Sections 841 (Illegal Distribution and

Dispensing of Controlled Substances) and 846 (Conspiracy to Distribute and Dispense Controlled Substances); violations of Title 18, United States Code, Sections 1347 and 1349 (Health Care Fraud) and 1956 and 1957 (Money Laundering); and Title 42, United States Code, Section 1320a-7(b) (Anti-Kickback Statute). Based on the same, probable cause also exists to search the SUBJECT ACCOUNT (more particularly described below and as set forth in Attachment A), for evidence, instrumentalities, and fruits of these crimes, as further described in Attachment B.

6.      All of the information contained in this affidavit is based on my personal knowledge and observations during the course of this investigation, information conveyed to me by other law enforcement officials, information related by witnesses, review of physical evidence obtained during the investigation, and a review of records including business records, patient records, and Medicare and Medicaid claims data. Unless otherwise indicated, all statements related herein are related in substance and in part, and are not verbatim. Because this affidavit is submitted for the limited purpose of establishing probable cause, I have not set forth each and every fact observed by me or known to law enforcement regarding this investigation.

## LEGAL PRINCIPLES

### A. UNLAWFUL DISTRIBUTING OR DISPENSING OF CONTROLLED SUBSTANCES UNDER TITLE 21

7.      The Controlled Substances Act ("CSA") governs the manufacture, distribution, and dispensing of controlled substances in the United States. *See* 21 U.S.C. § 801 *et seq*. It is a federal offense for any person to knowingly or intentionally distribute or dispense a controlled substance except as authorization by law. *See* 21 U.S.C. § 841(a)(1) ("Section 841(a)(1)"). It is similarly a federal offense to conspire to violate Section 841(a)(1). *See* 21 U.S.C. § 846.

8.      Medical professionals, including physicians, registered with the Attorney General are authorized under the CSA to write prescriptions for, or to otherwise distribute or dispense,

controlled substances, as long as they comply with requirements under their registration. Title 21, United States Code, Section 822(b). Such medical professionals are then assigned a registration number with the DEA.

9.     To comply with the terms of their registration, medical professionals cannot issue a prescription for a controlled substance unless it is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. 1306.04(a). Section 1306.04(a) provides that:

> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of Section 309 of the Controlled Substances Act (Title 21, United States Code, Section 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions relating to controlled substances.

10.     Put another way, a medical professional violates Section 841(a)(1) when he or she knowingly issues or fills a prescription for a controlled substance that is *not* for a legitimate medical purpose or within the usual course of professional practice. Analyzing this issue often turns on the facts of a particular case. There are nonetheless red flags that are indicative of prescriptions that are not issued for a legitimate medical purpose. Certain of these red flags are discussed below.

11.     The CSA and its implementing regulations set forth which drugs and other substances are defined by law as "controlled substances" and further assigns each drug or

substance to one of five schedules (Schedule I-V), depending on the drug or substance's potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

12. Schedule II drugs contain those commonly referred to as "opioids," generally known as Oxycodone, Oxymorphone, Hydrocodone, Oxycontin, fentanyl, and morphine sulphate. These drugs are highly addictive prescription painkillers, which may lead to severe psychological or physical dependence, overdose or death. These drugs are also routinely diverted for non-legitimate medical purposes and are often sold after prescribed and abused by those seeking a euphoric feeling or "high" from the drug.

13. Schedule IV drugs include, among others, benzodiazepines, which are commonly used to treat insomnia and anxiety. There is a potential for dependence and abuse of benzodiazepines particularly by individuals with a history of substance abuse. Alprazolam (Xanax) and diazepam (Valium) are some of the most prescribed benzodiazepines and most frequently encountered benzodiazepines on the illicit market.

14. Prescribing or issuing prescriptions for benzodiazepines and Schedule II opioids is frequently *not* for a legitimate medical purpose or outside the usual course of professional practice. Prescribing and issuing these two medications around the same time compounds the patient's risk of overdose and death from the prescribed drugs, by five (5) times. Moreover, there is a significant diversion risk of prescribing or issuing these drugs around the same time. A benzodiazepine serves as a "potentiator" for the opioid's euphoric effect and increases the "high" a user may obtain from opioid and is often sought for this non-legitimate medical purpose.

15. On March 16, 2016, the Centers for Disease Control and Prevention ("CDC") issued CDC Guidelines for Prescribing Opioids for Chronic Pain. In that guidance, the CDC

warned that medical professionals should avoid prescribing opioids and benzodiazepines concurrently whenever possible because of the risk of potentially fatal overdose.

16. On August 31, 2016, the U.S. Food and Drug Administration ("FDA") issued a Boxed Warning, its strongest warning, to the drug labeling of prescription opioids and benzodiazepines. The FDA specifically warned that combined use of opioids and benzodiazepines depress the central nervous system and results in serious side effects, such as slowed or difficult breathing and death. The FDA because of this harm warned health care professionals to limit prescribing opioids with benzodiazepines and cautioned that such medications should only be prescribed together for those patients for who alternative treatment options are inadequate.

## B. HEALTHCARE FRAUD UNDER TITLE 18

17. 18 U.S.C. § 1347 prohibits, among other things, knowingly and willfully executing or attempting to execute a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items or services. Section 1349 prohibits conspiracy to commit healthcare fraud.

18. Medicare is a health care benefit program for purposes of Section 1347 and as defined by 18 U.S.C. Section 24(b). The Medicare Program ("Medicare)" is a federal health care program providing benefits to persons who are over the age of 65 or disabled. Medicare is administered by the United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare & Medicaid Services ("CMS"). Individuals who receive benefits under Medicare are referred to as Medicare beneficiaries.

19. Healthcare providers that provide services to Medicare beneficiaries are required to enroll in Medicare and receive a provider number. Part of the enrollment process requires that

the healthcare providers certify that they understand and will abide by the federal laws and regulations governing their participation in Medicare, including a specific understanding of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7(b).

20. A health care provider that receives a Medicare provider number is able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim is required to set forth, among other things, the beneficiary's name and Medicare information number, the services that were performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other health care provider that ordered the services.

21. Medicare pays for certain prescription drugs for beneficiaries, what is commonly referred to as "Part D." To submit claims on behalf of Medicare beneficiaries, pharmacies contract with Medicare Part D plans. CMS regulations require that all subcontracts between Part D Plan Sponsors and downstream entities contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions, including the CSA. *See* 42 C.F.R. § 423.505(i)(4)(iv).

22. Medicare similarly requires of its providers, among other things, that all drugs prescribed or issued be medically necessary, comply with federal law, and be for a legitimate medical purpose and in the usual course of professional practice. *See also* 42 U.S.C. § 1395y. Claims that do not comply with these requirements, and others, are false and fraudulent claims and subject the provider to prosecution under Section 1347.

23. TennCare is Tennessee's Medicaid program and is administered pursuant to Title XIX of the Social Security Act. TennCare is also health care benefit program for purposes of

Section 1347 and as defined by 18 U.S.C. Section 24(b).

24.    TennCare is a joint program between the State of Tennessee and the United States of America, with approximately thirty (30) percent of the funding coming from the State of Tennessee and the remaining approximate seventy (70) percent coming from the United States Federal Government. TennCare serves indigent people who cannot afford health care insurance and uninsured or uninsurable people. Individuals who receive benefits under TennCare are referred to as recipients or beneficiaries.

25.    Similar to Medicare, medical providers must enroll with TennCare to become a provider. An accepted provider may then bill to, and receive payment from, TennCare for medical services and items provided to recipients. The Bureau of TennCare contracts with private insurance companies to provide insurance services to eligible persons ("enrollees"). Each of these private insurance companies is referred to as a managed care company ("MCC"). Each MCC contracts with medical service providers to render services to the enrollees. The medical service providers submit claims to the MCC, on behalf of the enrollee, and receive compensation based on those claims.

26.    For TennCare pharmacy claims, the state has assumed the financial responsibility of drugs. Through the Bureau of TennCare, the state contracts with a "Pharmacy Benefits Manager" ("PBM"), which actually pays the pharmacies. TennCare's PBM is called Magellan. For each drug, the PBM processes and reimburses pharmacy providers for all claims from TennCare enrollees. TennCare, through the PBM, pays funds directly to retail pharmacies that in turn dispense prescription medications to the TennCare recipient. The TennCare prescription program operates on a claim-for-service basis.

27.    TennCare requires of its providers, among other things, that all drugs prescribed or

issued be medically necessary, comply with federal law, and be for a legitimate medical purpose and in the usual course of professional practice. *See* Tenn. Comp. R. & Regs. 1200-13-16-.05(1)(a)-(c); *see also* 42 U.S.C. § 1395y. Claims that do not comply with these requirements, and others, are false and fraudulent claims and subject the provider to prosecution under Section 1347.

## C. THE ANTI-KICKBACK STATUTE UNDER TITLE 42

28. Title 42, United States Code, Section 1320a-7(b)(2)(A), prohibits the paying and receiving illegal remuneration, that is, knowingly and willfully offering, paying and receiving any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person or from any person or entity to induce such person to refer an individual or as an inducement to refer individuals for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal program.

29. Claims submitted to federal health care programs while also knowingly and willfully paying or receiving kickbacks or bribes in return for referring federal health care patients for medical services or items, is a violation of the Anti-Kickback Statute, under Title 42.

## PROBABLE CAUSE OF FEDERAL VIOLATIONS

*Relevant Individuals and Entities*

30. Affiant believes that GHEARING, and co-conspirators known and unknown, have unlawfully distributed and dispensed prescriptions for controlled substances. GHEARING, according to the investigation, has repeatedly and systematically distributed and dispensed controlled substances for no legitimate medical purpose and outside the usual course of professional practice.

31. GHEARING is a physician licensed with the State of Tennessee as of on or about January 24, 1986. GHEARING, according the State of Tennessee, specializes in family medicine. GHEARING is a provider with both Medicare and TennCare.

32. Investigators opened a criminal investigation of GHEARING based on his prescriptions that are indicative of issuing controlled substances for no legitimate medical purpose and outside the usual course of professional practice.

33. GHEARING, according to a review of Tennessee's Controlled Substances Monitoring Database ("CSMD"), has prescribed numerous controlled substances in combinations that indicate prescriptions for no legitimate medical purpose and outside the usual course of professional practice. From in or around December 2015 to in or around November 2018, GHEARING, according to CSMD, prescribed the following controlled substances:

| Drug Name | Drug Class | Number of Unique RXs | Number of RXs Including Refills | Number of Pills |
|---|---|---|---|---|
| OXYCODONE HCL / ACETAMINOPHEN | CII | 2,763 | 2,798 | 134,670 |
| ALPRAZOLAM | CIV | 1,735 | 2,862 | 190,200 |
| CLONAZEPAM | CIV | 1,095 | 1,752 | 107,354 |
| TRAMADOL HCL | CIV | 768 | 848 | 60,041 |
| CARISOPRODOL | CIV | 459 | 528 | 22,176 |
| HYDROCODONE BITARTRATE ACETAMINOPHEN | CII | 437 | 442 | 29,463 |
| GABAPENTIN | CV | 429 | 852 | 95,523 |
| DIAZEPAM | CIV | 291 | 405 | 26,069 |

34. In my training and experience, this prescription history is indicative of prescriptions that are not for a legitimate medical purpose and outside the usual course of professional practice.

GHEARING, as discussed herein, prescribes opioids with numerous potentiators, such as benzodiazepines (Alprazolam, Clonzepam, Diazepam) and Carisoprodol (a purported muscle relaxer). Prescriptions for potentiators and opioids, as discussed above, both increase the risk of overdose and death to patients and often sought to increase the "high" for opioids. Prescribing these drugs consistently together is, based on my training and experience, indicative of prescriptions issued for no legitimate medical purpose and outside the usual course of professional practice.

35. Patients of GHEARING, according to CSMD data, fill more prescriptions at Anderson Hometown Pharmacy, LLC ("Anderson Hometown"), than any other single pharmacy. Anderson Hometown is located in the same building as the Medical Office. Anderson Hometown Pharmacy pays GHEARING purported rent for the space of Anderson Hometown. Because GHEARING is Anderson Hometown Pharmacy's top prescriber for prescriptions dispensed, receives payment from federal health care programs for those prescriptions, and pays GHEARING rent, this relationship suggests a possible unlawful financial relationship in violation of the Anti-Kickback Statute.

## Criminal Investigation

### A. GHEARING Prescribing Controlled Substances Outside the Usual Course of Professional Practice and Not for a Legitimate Medical Purpose

*GHEARING's Prescriptions for the "Holy Trinity"*

36. GHEARING, according to CSMD, distributes and dispenses prescriptions for the "Holy Trinity," a drug cocktail that is sought out for diversion and poses an extremely high risk of overdose and death for patients. The "Holy Trinity" consists of prescriptions for the following drugs: a muscle relaxant (such as Carisoprodol, sold under the name Soma), a benzodiazepine (such as Xanax), and a Schedule II opioid (such as oxycodone). Affiant is not aware of a

legitimate medical purpose for these drugs to be prescribed to one patient in or around the same time. The "Holy Trinity" is a well-known drug cocktail of abuse among medical professionals and law enforcement.

37.  GHEARING, according to CSMD data, between June 2016 and November 2018, has prescribed the "Holy Trinity" to approximately twenty-seven (27) patients. These patients, according the same data, have filled approximately eighty-nine (89) prescriptions for the "Holy Trinity." GHEARING's practice of prescribing patients the "Holy Trinity" is a red flag for prescribing controlled substances for no legitimate medical purpose and outside the usual course of professional practice.

*GHEARING's Prescriptions for Opioids combined with Benzodiazepines*

38.  As noted above, individuals who divert prescription drugs often seek out prescriptions of benzodiazepines and opioids because of the potentiating effect the benzodiazepine has on the "high" of the opioid. Such drug combinations also pose a significant risk of overdose and death to the patient because of respiratory depression, as discussed above and as cautioned by the FDA and CDC.

39.  GHEARING, according to CSMD data, between February 2016 and November 2018, has prescribed benzodiazepines around the same time as opioids to approximately two hundred and fifty (250) patients. These patients, according the same data, have filled approximately 1,100 prescriptions for opioids around the same time as a benzodiazepine. Prescribing patients the combination of a benzodiazepine and an opioid is a red flag that GHEARING is prescribing controlled substances for no legitimate medical purpose and outside the usual course of professional practice.

*GHEARING's Prescriptions to a Confidential Source*

40.    On December 20, 2018, a confidential source ("CS") visited the TARGET LOCATION for a purported medical visit with GHEARING. Following that visit, GHEARING, Affiant believes, prescribed the CS a controlled substance, which Affiant believes to be not for a legitimate medical purpose and outside the usual course of professional practice. CS's visit to the Medical Office and CS's interactions with GHEARING was recorded on an audio/visual device.

41.    CS, who was a previous patient of GHEARING, visited GHEARING complaining of pain in CS's shoulder. CS told GHEARING that CS injured CS's left shoulder on Monday, December 17. CS's injury was fictional.[1] GHEARING physically examined the CS's shoulder for approximately three minutes. GHEARING concluded that CS had arthritis in CS's shoulder and probably had a flare up. GHEARING told CS that he would give CS a prescription for pain and one for arthritis. CS asked GHEARING if he could "get something for the pain." GHEARING confirmed that he would write CS something (a prescription) for pain for just a few days and something (a prescription) for arthritis. GHEARING confirmed later in the visit that he sent in "pain pills" and something for arthritis for CS.

42.    Affiant believes, based on his training and experience, that GHEARING's medical visit with CS was outside the usual course of professional practice for several reasons. First, GHEARING performed only a quick examination of CS's shoulder. Second, GHEARING

---

[1] Based on Affiant's training and experience, individuals seeking prescriptions for controlled substances frequently complain of non-existent injuries or exaggerate the severity of real injuries to induce physicians to prescribe controlled substances to be abused. Such actions are well known both within the medical community and law enforcement. Prescribers acting within the usual course of professional practice must be vigilant in guarding against this reality when prescribing controlled substances.

prescribed opioids to CS without trying other non-addictive treatments first, such as over-the-counter medication. Third, GHEARING did not counsel CS about the risks of opioids or even discuss with CS what opioids he was prescribing to CS. Fourth, GHEARING did not check the prescription history or CSMD of CS before prescribing opioids. Had GHEARING done so, he would have seen that CS was prescribed buprenorphine by another physician, which is generally a medication taken by those addicted to opioids. Further, GHEARING sent CS's prescriptions to Anderson Hometown. Anderson Pharmacy refused to fill GHEARING's prescription on behalf of CS for this reason. Neither CS nor Affiant know what "pain pills" GHEARING prescribed to CS because GHEARING sent CS's prescription electronically to Anderson Hometown, did not give CS a hardcopy of that prescription, and did not discuss the prescription itself with CS. Affiant believes that GHEARING nonetheless prescribed a controlled-substance opiate to CS because otherwise Anderson Hometown would not have refused to fill CS's prescription on the basis of CS's buprenorphine history.

*GHEARING's Prescriptions to an Undercover Agent ("UC"): January 8, 2019*

43.    UC visited the Medical Office for a purported medical visit with GHEARING. During the visit, GHEARING prescribed controlled substances to UC outside the usual course of professional practice. UC paid GHEARING $75 for this visit, and others, because UC purported to not have insurance. Each prescription from GHEARING to UC, based on Affiant's training and experience and as discussed below, is outside the usual course of professional practice.

44.    On January 8, 2019, the UC visited the Medical Office for a purported medical visit with GHEARING. Once inside the Medical Office, UC explained to an unidentified office worker that UC was there to see GHEARING for shoulder pain. UC's injury was fictional. UC later explained to GHEARING how UC's shoulder hurt all of the time and how UC had tried

ibuprofen and Tylenol but without benefit anymore. GHEARING examined UC's shoulder for approximately two minutes. GHEARING told UC that UC probably had arthritis in the joint and that he would prescribe something good for arthritis and something mild for the pain.

45. UC told GHEARING that UC knew nothing was broken or messed up or anything. UC then told GHEARING how UC is unsure whether UC should say anything, but how UC has taken medication from a friend and further how the medication "helps." Later in the conversation, UC told GHEARING that a buddy gave UC "hydros" and how UC took eight of those, which worked good. GHEARING again did not respond to this statement or otherwise ask follow up questions.

46. GHEARING told UC that he would prescribe UC something for arthritis and a "pain pill." UC asked about the pain pills. GHEARING noted that he wrote some stuff and that UC could take it if UC is "dying of pain." The pain pills, according to GHEARING, were not the secret and the thing is to figure out how to fix UC's injury. GHEARING informed UC that he planned to give UC a shot if the injury did not get better in a month or so. GHEARING told UC that UC could fill UC's prescriptions at Anderson Hometown next door and told UC to come back in three or four weeks.

47. On January 8, 2019, GHEARING prescribed UC twelve (12) pills of Oxycodone-Acetaminophen (5-325), a Schedule II controlled substance, and thirty (30) pills of Meloxicam, which not a controlled substance. UC filled these prescriptions at Anderson Hometown.

48. Affiant believes, based on his training and experience, that GHEARING prescribed UC controlled substances outside the usual course of professional practice for several reasons. First, GHEARING performed only a cursory examination of UC's complained injury. Second, GHEARING ignored obvious red flags of diversion that UC brought to GHEARING's attention,

including taking controlled substances without a prescription and referring to such medication as "hydros," a slang or "street" term for hydrocodone that is associated with diversion. Despite knowing that UC took controlled substances without a prescription, GHEARING still prescribed UC controlled substances and made no known effort to check the UC's prescription history. Third, GHEARING did not explain the risks of the opioids to UC or otherwise provide UC any information about the controlled substances other than to take the pills if UC was "dying of pain." Fourth, GHEARING prescribed UC a controlled substance during UC's first visit with him.

*GHEARING's January 14, 2019 Prescriptions to an Undercover Agent ("UC")*

49. On January 14, 2019, UC returned to the Medical Office for a follow-up visit with GHEARING, which was recorded on an audio device. During the visit, GHEARING prescribed controlled substances to UC outside the usual course of professional practice.

50. UC told GHEARING that UC's shoulder was a little better. UC explained to GHEARING that she noticed a big difference in UC's pain levels once she ran out of the pain pills. GHEARING briefly examined UC's shoulder. GHEARING told UC that he did not want UC to take the pain pills very much, just to take them until UC started moving UC's shoulder and until the other "stuff" could get into UC's system. GHEARING recommended that UC do jumping jacks to loosen up UC's shoulder. After an unrelated discussion, GHEARING told UC that he "sent in" pain pills and an unrelated medication for UC. GHEARING told UC to move around and that he would consider an x-ray or shot if it does not get better.

51. UC asked GHEARING to prescribe Xanax (a benzodiazepine) to UC. GHEARING told UC that it's so easy to get addicted to Xanax and how everyone is anxious at times. UC told GHEARING that UC is already taking Xanax because UC gets them from Ms. Gilbert. GHEARING asked if Ms. Gilbert is a nurse. UC told GHEARING that Ms. Gilbert is a friend.

GHEARING responded that the problem with Xanax is that they are so addictive and how once someone gets on Xanax it is hard to get off. GHEARING referred UC to Dale Hollow Mental Health if UC wants those medications and told UC that he will not do that (prescribe Xanax) just yet. UC asked GHEARING about the medication that he sent in. GHEARING told UC that he sent in the "same number" and not to take the medication unless UC has to – "like crying" in pain. GHEARING told UC that he does not want UC to take too much.

52.    On January 14, 2019, GHEARING prescribed UC twelve (12) pills of Oxycodone-Acetaminophen (5-325), a Schedule II controlled substance, and an unrelated medication. UC filled this prescription at Anderson Pharmacy.

53.    Affiant believes for the reasons stated above that GHEARING's prescription was outside the usual course of professional practice. GHEARING notably prescribed UC controlled substances after having direct conversations with UC about UC taking another controlled substance from a friend (diversion).

*GHEARING's January 22, 2019 Prescriptions to UC*

54.    On January 22, 2019, UC returned to the TARGET LOCATION for a follow-up visit with GHEARING, which was recorded on an audio/visual device. During the visit, GHEARING prescribed UC controlled substances outside the usual course of professional practice.

55.    GHEARING again quickly examined UC's shoulder and informed UC that he would get UC an X-ray and possibly an injection. UC asked GHEARING if UC could make the medicine last longer. GHEARING replied that he usually does not give pain medicines, just once in a while. GHEARING stated that he does not want UC to be on any pain medication and wants to fix UC's shoulder. UC persisted in requests for additional pain medicine. GHEARING

described how he would like to have UC take an x-ray to determine what is going on with UC's shoulder and explained how he wanted UC to get a shot in UC's shoulder, an offer which UC rejected.

56. On January 22, 2019, GHEARING prescribed UC twelve (12) pills of Oxycodone-Acetaminophen (5-325), a Schedule II controlled substance. UC filled this prescription at Anderson Pharmacy. Affiant believes that GHEARING's prescription was again outside the usual course of professional practice for the above-cited reasons.

*GHEARING's January 31, 2019 Prescriptions to UC*

57. On January 31, 2019, UC returned to the TARGET LOCATION for another visit with GHEARING. During the visit, GHEARING again prescribed UC controlled substances outside the usual course of professional practice. This visit was recorded on an audio/visual device and is summarized below.

58. UC and GHEARING discussed the results of UC's x-ray for UC's shoulder. GHEARING described how UC has arthritis in UC's shoulder. GHEARING described how he "didn't know what was wrong with [UC] before."

59. UC and GHEARING discussed UC's prescriptions. UC tells GHEARING that the pain pills worked better than the anti-inflammatory medicine GHEARING also prescribed. GHEARING told UC that the pain pills just cover up the pain and recommended that UC get a shot in UC's shoulder, which would lessen the pain for about two weeks.

60. UC told GHEARING that GHEARING needed to write UC a prescription for "Valium or something" because of UC's feelings after hearing UC has arthritis. GHEARING responded that he can write UC something for anxiety. GHEARING told UC that the news about arthritis is not terrible and how it is not like cancer. GHEARING told UC that it is unusual for

UC to have arthritis in UC's shoulder without something bad happening to UC. GHEARING then told UC that he sent in UC prescriptions for pain and Xanax.

61.     On January 31, 2019, GHEARING prescribed UC twelve (12) pills of Oxycodone-Acetaminophen (5-325), a Schedule II controlled substance, and sixty (60) pills of Alprazolam (Xanax), a Schedule IV controlled substance. UC filled this prescription at Anderson Pharmacy. Affiant believes that GHEARING's prescriptions were again outside the usual course of professional practice. Notably, GHEARING prescribed UC Xanax after UC told GHEARING what he needed to prescribe. This behavior, according to Affiant's training and experience, is consistent with drug-seeking behavior. Further, GHEARING had previously warned UC about the significant risks of addiction associated with Xanax, as described above. Nonetheless, GHEARING prescribed UC what he knows to be a highly addictive drug after UC's specific request for the drug and in conjunction with a Schedule-II opioid. Such conduct is outside the usual course of professional practice and not for a legitimate medical purpose.

62.     During the UC visits described above, GHEARING did not request urinalysis screening of the UC to determine what controlled substances the UC was taking. This is a practice normally performed by providers prescribing controlled substances to determine if a patient takes medications as prescribed, diverts the medications, or is already taking other legal or illegal substances. The absence of GHEARING requesting urinalysis is a sign that GHEARING's conduct is outside the usual course of professional practice and not for a legitimate medical purpose.

**B. Search of the Medical Office for GHEARING located at 151 McArthur Avenue, Celina, Tennessee 38551**

63.     On February 7, 2019, Magistrate Judge Jeffrey S. Frensley, issued a search warrant

for GHEARING's Medical Office located at 151 McArthur Avenue, Celina, Tennessee 38551.

64.    On February 8, 2019, the DEA, U.S. Department of Health & Human Services Office of the Inspector General, and the Tennessee Bureau of Investigation, conducted the search of the Medical Office.

65.    During that search, Affiant and other law enforcement officers discovered that the Medical Office, and GHEARING's other medical office location at 100 Old Jefferson Street, utilized a cloud-based server at a company called eClinicalWorks for its patient medical records. At the time of the search, law enforcement obtained the eClinicalWorks account information for GHEARING/the Medical Office. The account information includes the user key: 24569219-9a70-4aba-9166-2f99c44b4dca, APU No: 32197 (the SUBJECT ACCOUNT).

66.    eClinicalWorks is a software company headquartered in Westborough, Massachusetts, and has regional offices throughout the United States. eClinicalWorks hosts a cloud-based server to store electronic health records for medical providers. Subscriptions to eClinicalWorks electronic health records can be obtained through their website at https://www.eclinicalworks.com/products-services/ehr-for-practices/.

67.    On February 14, 2019, the United States Attorneys' Office for the Middle District of Tennessee, under the authority conveyed by 18 U.S.C. § 3486, served a subpoena on eClinicalWorks for certain patient medical records and account enrollment documents associated with the SUBJECT ACCOUNT. The subpoena specifically excluded the production of any "in-application email, instant messaging, or other inter- or intra-office communications not constituting or contained within a specific patient's medical records . . . ."

68.    On March 6 and March 7, 2019, law enforcement conducted interviews of current

employees of GHEARING.

69.     GHEARING's employees told agents that they used the SUBJECT ACCOUNT's internal email / messaging system to communicate with GHEARING and each other about patients of GHEARING, controlled-substances prescriptions, and other issues. Such communications, according to these employees, are added to a patient's file.

70.     GHEARING's employees explained to law enforcement agents that they have provided information and expressed concerns about GHEARING's controlled-substances prescriptions using the SUBJECT ACCOUNT, as recently as February 2019.     The following summarizes the information provided by GHEARING's employees about certain of GHEARING's patients.

    a.  Patient J.T.

           i.  On February 13, 2019, an anonymous male caller contacted GHEARING's Medical Office and stated that J.T., a patient of GHEARING at GHEARING's 100 Old Jefferson Street location, took all of her Xanax at one time. C.T, an employee of GHEARING, advised the caller to take J.T. to the Emergency Room. The caller replied that J.T. had jumped out of the car and left. C.T. stated that she notified GHEARING about the incident two times via internal email (messaging) through the SUBJECT ACCOUNT. GHEARING instructed C.T. to cancel all refills of Xanax for J.T. and called J.T. into the Medical Office for a drug screen and pill count. C.T. was unable to reach J.T.

          ii.  On March 4, 2019, J.T. came to the Medical Office for an appointment. J.T. did not bring her medication for a pill count nor did GHEARING order a

drug screen. C.T. reminded GHEARING of the event that occurred on February 13, 2019, via internal email. C.T. stated that GHEARING still gave J.T. a prescription for Xanax that day.

b. Patient W.B.

    i. On February 26, 2019, patient W.B. came to the Medical Office for an appointment. C.T. recalled that W.B. had a negative drug screen despite having prescriptions for opioids. According to C.T., it should be documented in the patient file via patient records and email or instant message communications that family members of W.B., who are also patients of GHEARING, have reported to GHEARING multiple times that W.B. stole their controlled-substances medications on more than one occasion. W.B. consistently does not show up as directed by GHEARING's staff for pill counts or drug screens. C.T. specifically documented these failures on 11/16/18, 12/3/18, and 12/10/18. On 07/17/18 W.B. submitted to a drug screen and tested positive for suboxone, opioids, and morphine. In late 2018, C.T. recalled that W.B. overdosed and was treated at a Hospital in Celina, TN. C.T. has since checked the patient file and observed those notes made in reference to the overdose where missing from the patient file.

c. Patient C.H.

    i. In or around March 2017, C.H. was a patient of GHEARING. During this time, current employee A.H. and former employee A.K. were employed at the Medical Office. A.K. is the mother of A.H. According to A.H., A.K. voiced concerns to GHEARING about C.H. and the medications

GHEARING prescribed to her. C.H. requested help with her addiction to pain medications. A.H. believes that several weeks later, C.H. died. According to A.H., A.K. discussed C.H.'s death with GHEARING. GHEARING told A.K. that it was not possible that the medication he prescribed could have contributed to C.H.'s death due to her weight. A.K. documented notes in eClinicalWorks. Recently A.H. checked C.H.'s patient file and did not see the notes.

71.     The above described are examples of incidents when employees voiced concerns to GHEARING in electronic communications using the SUBJECT ACCOUNT, in the form of internal emails and instant messages.  Based on interviews with GHEARING's employees, electronic communications between GHEARING and his employees in the SUBJECT ACCOUNT include, but are not limited to, employee's concerns about patients to whom GHEARING prescribes controlled substances, patient messages, issues about drug screens, and pill counts.

## PROBABLE CAUSE TO BELIEVE EVIDENCE OF CRIMES, AMONG OTHER THINGS, WILL BE FOUND AT THE TARGET LOCATION

72.     Affiant believes that evidence, records, instrumentalities and other evidence of the above-referenced crimes will be found in the SUBJECT ACCOUNT.  The above paragraphs are incorporated by reference into this section.

73.     The Health Insurance Portability and Accountability Act (HIPAA) of 1996 requires covered entities, such as pharmacies billing Medicare and Medicaid (TennCare), to retain required documentation for six (6) years from the date of its creation or the date when it last was in effect,

whichever is longer. HIPAA requirements preempt state laws if they require shorter periods. *See* 45 CFR § 164.316.

74. Under Tennessee statute, providers submitting claims to TennCare, like GHEARING, must maintain records for a minimum of five (5) years after the date on which payment was received. *See* Tenn. Code Ann. § 71-5-2602.

75. As noted above, current employees of GHEARING report regularly utilizing the SUBJECT ACCOUNT to communicate with GHEARING about their concerns related to patients and the prescribing of controlled substances by GHEARING to patients, including as recently as February 2019.

76. In my training and experience, and on my consultation with other law enforcement officers experienced in investigations regarding unlawful distribution of controlled substances, health care fraud, financial fraud, and money laundering, persons involved in the unlawful distribution of controlled substances, including physicians, often maintain files in their medical offices for patients who visit such locations. From my training and experience, I know that physicians keep these types of patient records and controlled-substance records on paper, electronically on computers, or in other electronic formats, including on cloud-based servers.

77. I expect that officers will find evidence of controlled substances distribution and health care fraud within the SUBJECT ACCOUNT, in the form of electronic medical records and electronic communications such as email and instant messaging, as described more particularly in ATTACHMENT B, hereby incorporated by reference.

78. Your Affiant is requesting to search the SUBJECT ACCOUNT for evidence of violations of the Controlled Substances Act, health care fraud, and related financial crimes, as described in this affidavit.

## <u>INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED</u>

79.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require eClinicalWorks to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.   Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## <u>CONCLUSION</u>

80.     Based on the forgoing, I request that the Court issue the proposed search warrant.

81.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.